[Crim. No. 2869.  Second Appellate District, Division One.—July 13, 1936.]

THE PEOPLE, Respondent, v. HERMAN FLORES et al., Appellants.

Jesse Bach Porter for Appellants.

U. S. Webb, Attorney-General, and Paul D. McCormick, Deputy Attorney-General, for Respondent.

ROTH, J., *pro tem.*—Appellants were charged by an amended information, containing thirteen counts. Count I charged a violation of section 209 of the Penal Code, to wit, kidnaping for the purpose of robbery; count II, the crime of kidnaping, a felony; counts III, IV, V, VI and VII, the crimes of rape, felonies; counts VIII, IX, X, XI and XII, violations of section 288a of the Penal Code; and count XIII, the crime of attempted robbery, a felony.

Appellants pleaded not guilty to the charges set forth in the amended information. Thereafter jury trial was had and appellants were found "not guilty" of counts I, II, VIII, IX, X, XI, XII and XIII of said amended information, and "guilty" of the crimes as charged in counts III, IV, V, VI and VII of said amended information. These are appeals from the judgments after conviction, and from the orders denying appellants' motions for new trial. All appeals will be treated in this one opinion.

The attorney-general on this appeal summarizes the evidence in the case substantially as follows: "The evidence most favorable to the prosecution shows that on December 15, 1935, the complaining witness in this case, a certain Gertrude Stark, also known as Mrs. Johnson, left her place of employment and entered a picture show on Spring Street in the down-town part of Los Angeles. Mrs. Stark remained in the picture show . . . approximately one hour . . . and then proceeded to the Boyle Heights District in the vicinity of First and Utah Streets. Arriving there (at approximately two in the afternoon) she went into the El Dorado Cafe near First and Utah Streets. . . . She was in the Cafe until around ten o'clock p. m., the evidence showing, however, that during this period of time she left for a short while. . . . (It will be shown hereafter that complaining witness left, and visited other places in the afternoon.) She (finally) left the El Dorado Cafe *around ten o'clock* in company with two men named Uroff and DeHara (hereinafter sometimes called O'Hara). She had requested these men to escort her because of fear of the persons she had seen on the outside of the Cafe. . . .

"As the three left the Cafe they went out to Utah and toward First Street. DeHara apparently had an automobile and offered to drive the complaining witness home and the two of them proceeded to walk toward his automobile. At that time, about twelve men (including the five defendants) were following the complaining witness and DeHara. . . . After walking a short distance toward DeHara's car, the men following them approached the two, struck DeHara and pulled Mrs. Stark away from him; then they grabbed her and took her into an alley place about one hundred feet away. In the alley the men told her to shut up (there is no showing that the complaining witness was threatened or that she was unable to scream before she arrived in the alley), that they would kick her teeth down her throat if she did not keep quiet. Thereupon the group of men attacked Mrs. Stark and, according to her testimony, approximately nine acts of sexual intercourse were performed upon her. She further testified that besides these acts of sexual intercourse, various acts which if consummated would constitute violations of section 288a of the Penal Code were forced upon her. As to these acts as charged in the amended information, the appellants were found not guilty. Mrs. Stark . . . identified the five (appellants) as being amoung the group of men who attacked her and testified that each and every one of the five appellants performed an act of sexual intercourse with her. She stated that beside the five appellants performing acts of sexual intercourse with her, approximately two other men not on trial also attacked her on that occasion. Her testimony was to the effect that the appellant Flores committed the first act; that he was followed by appellant Olivas, and that the next one was a certain Paul Bazaure (variously referred to as Bazaure or Bazaura), not a defendant in the instant case. During the time that Mrs. Stark was being attacked her purse was taken away from her, searched and thrown somewhere into the alley. At this time the complaining witness was dressed *in a grey skirt, black blouse and had on a hat and coat.* She testified that during the course of the attack she was held by the arms and her feet and stretched out on the ground on her back, and that the acts were committed by

force and without her consent. While the vicious offense was taking place, two men appeared; about this time the attacking persons fled and the complaining witness was left alone in the alley. Thereafter she knocked at someone's window and told them to call the police. (Who this person was does not appear anywhere in the record.) DeHara and another man joined her about this time and later in the evening she saw one of the appellants on Utah Street. Mrs. Stark with a Jack Uroff and his brother went to their house and later made a complaint to the police, the police arriving at about *1:30 a. m.* . . . (The attorney-general omits to state that the party of three met a policeman in a cafe, and also a policeman in a radio car, on their way to Uroff's home.)

"When the police arrived (at Uroff's home) Mrs. Stark was bareheaded, had a full length coat on and a *dark* dress. She did not have a purse upon her person, her dress was soiled, her hair was mussed up, she was quite nervous and some kind of dirt was lodged in the back of her hair. The police officers, together with Mrs. Stark, went into an alley that runs between Utah Street and Anderson Street just North of First Street. There Mrs. Stark found her hat and her purse. . . .

"Mrs. Stark was taken to the County Hospital and arrived there around 2:24 a. m., on the morning of December 16th. She was examined by a doctor in the hospital and after taking of certain vaginal smears, evidence (of spermatozoa) was found . . . The doctor who examined her further testified that he found *one small bruise on the left hip* of the subject. . . .

"It appears that on December 23rd, a conversation was held with certain police officers and a certain Paul Bazaure (not a defendant) who, according to the testimony of Mrs. Stark, was a participant in this vicious attack, at which conversation was present appellants *Flores, Olivas* and *Araujo*. At the time of this conversation Bazaure was asked if he was in the alley back of the Illinois Apartment on the night of the 15th and he said that he was. He was asked if he had intercourse with a woman known as Mrs. Gertrude Johnson and he said that he had. He was asked which turn he had in having intercourse with this woman and he

stated that he was third. He was then asked if Flores was present and he said yes that he was. He was asked if Flores had intercourse with Mrs. Johnson and he said yes that he had. He was then asked if Araujo was present in the Alley back of the Illinois Apartment and he said that he was. He stated that Araujo also had intercourse with Mrs. Johnson. He was then asked if Olivas had intercourse with Mrs. Johnson at that time and on that occasion and he stated that he had. Although the appellants were present at this conversation the record shows that they made no statements immediately thereafter. However, a few minutes later when the same people were present Flores was asked if he could tell the officers how these men came in turns, or rather who took the first turn in having intercourse with Mrs. Johnson, and he replied 'How could you tell when they were all down there in a mess like that?' An officer then made a motion and said, 'They were like a bunch of dogs?' and Flores answered 'Yes'.

"The record further shows that on December 25th, a conversation was had with appellant Salazar, and a police officer of the City of Los Angeles, in which Salazar was asked if he was present in the rear of the Illinois Apartments near First and Utah on the night of December 15th, when a girl named Gertrude Johnson was attacked and raped by a gang of Mexican boys and he replied 'No'. He was then asked what kind of clothes he was wearing that night and if he was in the vicinity of First and Utah and he said he was in the vicinity of First and Utah and that he was wearing a brown cloth jacket and a pair of brown pants. At this conversation Paul Bazaure was also present and was asked in the presence of appellant Salazar if Salazar was present at the time of the attack and he said that he was. Then Bazaure was asked if Salazar had intercourse with the woman and he said that he had. Bazaure was then asked about some other acts of Salazar upon this woman and Salazar was then asked what he had to say about that and Salazar said, 'I was there, standing within five or six feet of the woman all the time, which was about half an hour.' Salazar, however, denied that he had any personal contact with the woman and denied that he had intercourse or performed other acts upon her." (Italics and parenthetical inserts ours.)

During the time that these acts took place cars were going back and forth in the alley; some lights came down the alley, and the boys jumped over the fence, which was about 7 feet high. Mrs. Stark testified that Jack Uroff and De-Hara came down the alley with a flashlight. DeHara testified he met two policemen at Anderson and Utah Streets; that they searched the alley but found no trace of Mrs. Stark or the boys. John Uroff testified that later Mrs. Stark came running up the street and knocked on various windows; that he, his brother Jack, and Mrs. Stark went to Brooklyn and Boyle, where they met an officer in a cafe. They later met another officer on First and Boyle, with a radio car, and went back to the alley about one or two A. M.

The evidence further showed that the complaining witness was the mother of four children, none of whom lived with her, and that she had been for eight or nine years last past living with a man named Johnson, although still married to her first husband, Stark. She admitted that she had had intercourse with Johnson on the night of December 14th. During the afternoon, when she left the cafe at First and Utah in company with two other women and some men, she visited two or three beer parlors or bootlegging places. One witness, a Mexican barber, testified that he had had intercourse with her on the afternoon of December 15th. This she denied, but the testimony was uncontradicted that she did go into his barber shop and enter the back room where the barber lived. With reference to one of the places she visited, the complaining witness testified:

"A. Yes, she told me it was her home, but it wasn't, it was a bootlegging place. Q. So you and this Russian (Jack Uroff) and Manuel the barber went to this bootlegging place? A. Yes, we all went together. Q. Then, did you go into the bedroom in there? A. Yes, to get my coat and hat. Q. And was Joe in there with you? A. Who is Joe? I don't know any Joe. Q. Was there a man in the bedroom with you at that time? A. Yes, and a girl. Q. The girl and the man were in the bedroom with you? A. Yes. Q. Who was the girl? A. Jennie. Q. That was Jennie? A. Yes. Q. After you went in this bedroom, how long did you stay there about? A. We stayed until about 10:00 o'clock. Q. You stayed until about 10:00 o'clock? . . . Q. The first

time you say you saw this Russian was at about 2:00 o'clock when he came to that cafe, is that right? A. In the afternoon? Q. Yes. A. No, I seen him at night about 6:00 o'clock. Q. At about 6:00 o'clock? A. . . . Q. Now, when did you first know the name of this Russian? A. In court. Q. What is that? A. In court. Q. Oh, in court? A. Yes, sir. Q. When you noticed—when you were introduced to him by Jennie and when you went to this bootlegging joint, you didn't know his name? A. She didn't mention any name. Q. She didn't mention any names? A. No, sir. Q. Not first names or anything else? A. No, sir.''

It should also be noted that the complaining witness testified that she did not even know the name of DeHara, who, it will be recalled, was the other man in whose company she left the cafe at First and Utah immediately prior to the alleged offense. In this respect she testified: ''Q. Did you know this Mr. DeHara at that time? A. No, I had never seen him before. Q. That was the first time you knew Mr. DeHara? A. Yes, I met him there. Q. You met him in that place? A. Yes. Q. Did anybody introduce you to him? A. Yes. Q. Who? A. The lady that runs the beer parlor. Q. Do you know what her name is? A. No. Q. How did she introduce you? A. She asked me if it was all right for him to take me home. Q. She asked you—I see. Had you ever met this lady before? A. No, sir. Q. Do you know what her name is? A. I don't.''

The complaining witness testified that during all of her perambulations she had nothing to drink but a glass of milk. This was emphatically contradicted.

The doctor who examined her in the county hospital testified in substance, that she was calm and cool, showed no evidence of any physical injuries except a small bruise on the left hip, which was not connected with the alleged crime; that no spermatozoa was found, and it was necessary to send slides of vaginal smears to an outside laboratory, where an infinitesimal amount of spermatozoa was discovered.

Defendants testified individually that they were not in the alley; that they did not follow Mrs. Stark; that they had no acts of sexual intercourse with her; that they were not present when such acts were performed. They accounted for their activities on the night of December 15th, and testified re-

spectively as to the times that each arrived at their respective homes.

A Mrs. Ureta, testifying for the defense, said that Mrs. Stark was soliciting some boys to commit various acts upon her, and that when lights were flashed in the alley Mrs. Stark would run away and then return; that during the time .Mrs. Stark was soliciting the boys mentioned, a police car came into the alley with two policemen, and that Mrs. Stark ran around Mrs. Ureta's house, stumbling over certain objects in her yard.

The amazing fact about this sordid recital is the total lack of physical evidence to prove the crimes of which appellants (all, with one exception, under the age of 21) were jointly convicted and sentenced severally, consecutively on each count, said total sentences being for a maximum of 250 years. A brief excerpt of the testimony of the complaining witness as to the actual offenses committed is as follows:

"Q. . . . Now, you stated in your testimony that there were six boys who had sexual intercourse with you, did you not? A. I said. nine. Q. Nine? A. Yes. Q. I see. And there were how many that had intercourse with you in the mouth, that is put their private parts in your mouth? A. About three. Q. About three? A. Yes. Q. And you said that Paul Bazaura put his private parts in your mouth? A. Yes, sir."

Paul Bazaura, mentioned in the foregoing testimony, was held in juvenile hall after the commission of the alleged offenses, and did a lot of testifying for the prosecution. The complaining witness further testified:

"Q. . . . Now, you were laid down on the ground, were you? A. Yes. Q. Did you tell the boys at that time. 'Come on, just wait a minute?'" A. Yes. Q. And 'Mr. Bazaura, was he on the fence at that time? A. He was standing right there by me. . . . A. Yes, as soon as the boys left I got up and went to the window and called for help. . . . Q. You came out of the lot and knocked on the window? A. Yes. Q. I see. Now, how far from that window that you knocked on did you travel before anybody came? A. Well, I stood there for a little while, hollering. Q. You stood there for a little while hollering? A. Yes. Q. And what then? A. And O'Hara came up to me. Q. O'Hara came up to you? A. And the Russian. Q. I see. They were by themselves?

A. Yes, sir. Q. And did you see any of these particular boys in the vicinity at that time? A. No, they all ran. Q. They all ran? A. Yes. . . . Q. Now, which direction did you go after Mr. DeHara and Mr. Uroff came to you? A. I went back to Utah Street. Q. Oh, you went back to the same place, the same beer parlor? A. No, sir, I went to this Russian's house. Q. Mr. Uroff's house? A. Yes. Q. Where is his house? A. I don't know. Q. Is it very close there? A. It was about three blocks, I think. . . . Q. . . . I mean, how long did you stay at Mr. Uroff's place, did you say? A. I don't know. Q. And when you were at Mr. Uroff's place, what did you do? A. I washed my face. Q. You just washed your face? A. Yes, sir. Q. Nothing else? A. No. Q. What else? A. I cleaned myself. Q. I see. Then where did you go? A. They went out after the police. Q. Who did? A. This Russian and his brother. Q. And his brother? A. Yes. Q. I see. Well, was that Mr. DeHara his brother? A. No. Q. Who was it? A. I don't know.''

If the evidence of the complaining witness is to be believed, she was the victim of as vicious and brutal a series of rapes by physical force as has ever been recorded in a law book, yet the only physical evidence of intercourse, accepting the testimony of the complaining witness and that of the witnesses for the prosecution as true, is, (a) ''small bruise . . . on the left hip''; (b) matted dirt in her hair on the back of her head; (c) slight evidence of spermatozoa in the vaginal tract, demonstrated by vaginal smears upon slides under a microscope; (d) dried-up stuff on her dress. Two of these physical facts may be eliminated at once. It was admitted by the doctor who made the examination in the county hospital immediately after the complaining witness' arrival, and who testified for the prosecution, that the bruise on her left hip was in no way connected with the series of rapes. The dried-up stuff which one of the officers testified he saw on her dress was seen by the officer on a *dark* dress, and the evidence shows that she had on a light gray one at the time the crimes were alleged to have been committed. The dirt in her hair is, it must be admitted, at least indicative of the fact that she lay down or was thrown down or held down in an alley or on the ground adjacent to the alley. The evidence of spermatozoa shows that she had had intercourse with someone at some time before she was taken to the hospital.

There is a complete lack of evidence, or even a suggestion thereof, showing any inflammation of the vagina or mouth. There is no evidence whatsoever of bruises, scratches, cuts, bumps, tears, discolorations or any other kind of external injury. There was no evidence of internal injury, and no complaint of any at any time. Nor is there any evidence of any soreness, except some slight testimony of the complaining witness that she felt sore about the chest and stomach, but there was no physical evidence of any such soreness at the time she was taken to the hospital. Of intense significance, also, is the fact that not an article of clothing was introduced as evidence, and the total lack of evidence that any clothing was torn, ripped or soiled, with the exception of the testimony of one officer that there was some dried-up stuff on a *black* dress. The light gray dress the complaining witness wore at the time of the crimes was not introduced or alluded to in any way; neither were the black blouse, stockings, shoes, underwear or any other accessories.

When one remembers that the complaining witness testified that she was forcibly taken away from two men, one of whom was hit on the head; that she was carried into an alley, dropped or dragged to the ground, and held down by two men, who pinned her arms to the ground with their knees while two others held her legs, and that while she was so held the appellants and others performed acts of sexual intercourse with her in a natural manner, while still others copulated with her mouth; and that the only apparent physical evidence, within a maximum of four hours after they are alleged to have taken place, of such a brutal series of acts, is matted dirt in the hair on the back of one's head and some dried-up stuff on a dark dress, we say that the story is one that should receive the most searching and rigorous scrutiny and analysis.

In the whole sordid record, consisting of over 600 pages of evidence, there is not a single sentence, phrase or word indicating or suggesting that the complaining witness made a single outcry until after the alleged offenses had been perpetrated, at which time, she testifies, she made one. There is not a scintilla of evidence that from the commencement to the end, or during any part of the salacious episode, anyone put his hand over her mouth. There is not a scintilla of evidence in the record that she bit or scratched,

although she testified that she was held so tightly that she could not kick. When taken to the hospital, the complaining witness was examined. The record shows that she showed no signs of hysteria, not even slight nervousness, and within a few minutes after the doctor's examination, the testimony shows that she fell into the arms of Morpheus. There is no suggestion that she was given any drugs or sleeping potion by the doctor or anyone else. We are compelled to observe that such a peaceful reaction does not follow so frightful an experience. The doctor, testifying as to her condition and appearance at the time she was examined, said:

"Q. What was she, excited at all, or nervous, or under any strain? A. No, the patient seemed to be very calm and very collected, and I made the note that she was comfortable and that she cooperated. We observed that she promptly went to sleep when we left her alone. Q. There was no evidence of any excitement whatever? A. No, sir."

According to the evidence of some witnesses, the complaining witness left the cafe at First and Utah at 10 o'clock P. M. According to others, she left between 11 and 12 o'clock P. M. There is no contradiction of the fact that the alleged licentious episode did not consume more than approximately one-half hour, yet the police were not notified until after 1 o'clock A. M.

According to the testimony of the complaining witness, she knocked on some windows, after her frightful experience, to get help. Instead of getting help she met Jack Uroff (whose name, it will be recalled, she did not even know until she saw him in court) and his brother, and went to their home (it will also be remembered that in the meantime the three of them had met a policeman), washed up, and then called the police. If the version of the complaining witness of this part of the story is to be believed, at least one and one-half hours, and possibly two hours, elapsed between the conclusion of the episode which has been partially described and the arrival of the police. We do not think that such conduct is consistent with the ordinary and natural reaction of even a depraved woman who has been outraged in so dreadful a manner as the testimony of the complaining witness indicates.

The uncontradicted testimony shows that after Mrs. Stark had been forcibly taken from the company of DeHara and Uroff, DeHara kept on walking (he was supposed to have

been hit on the head) and met two officers at the corner of Anderson and Utah Streets, and that in company with these officers he returned to the alley; that all three searched the alley and found no trace of Mrs. Stark or the boys. The complaining witness testified, and the uncontradicted testimony is, that the alley was dark, and yet, under the circumstances of the assault described by the complaining witness, she identified all five appellants, none of whom she had ever seen before. In this connection, it should be mentioned that she not only identified defendants, but identified them in the order in which they had had intercourse with her. The evidence also shows that she identified others who were in no way connected with the crime, and who were never brought to trial. It is also of some importance to note that in spite of the positive identification of five defendants out of a crowd she variously described as beween twelve and fifteen persons, the complaining witness could not even approximately fix the spot in the alley where the alleged offenses took place. In this connection she testified: ''Q. Do you have any recollection of the place where you were in the alley? A. No. Q. You have no recollection? You would not be able— A. It was in the back of a building; that is all I know. . . . Q. In fact, there is concrete back there, isn't there, cement? A. I don't know. . . . Q. Now, you stated about this alley. Did you see a house at this alley? Did you see a house at all in this alley? Did you see anything like this in the alley (exhibiting photograph to witness)? A. I couldn't see at that time; it was too dark.

Some further excerpts of her testimony, indicating the nature of the identification made and the circumstances under which she had had an opportunity to identify, are as follows: ''Q. How tall are you compared with these 15 men you say were there; were you taller or shorter than most of them? A. Some of them were short and some of them were tall.''

Referring to Bazaura (not a defendant) who, according to her story, was at the time of the hereinafter excerpted testimony performing an act in violation of section 288a of the Penal Code, the complaining witness testified: ''Q. Was there a light there at all? A. No. Q. No light? A. No, there was no light. Q. Then, how could you see him? A. I could tell the way he talked. Q. What? A. I could tell

the way he talked. Q. Oh, he was talking at that time? A. Yes. Q. What did he say? A. He told me to open my mouth."

Earlier, with reference to Bazaura, she had testified: "Q. Yes, and you said he was holding you with his hands; where was he holding you with his hands? A. He had one hand on my head. Q. One hand on your head? A. Yes. Q. Where was the other hand? A. Forcing my mouth open. Q. What? A. Forcing my mouth open. Q. Oh, forcing your mouth open? A. Yes."

She further testified: "Q. . . . About nine of them, you say, laid on you full length, is that right? A. Yes. Q. Were you at all frightened when they were on top of you like that? A. I beg your pardon? Q. Were you at all frightened when they were on top of you? A. Yes. Q. Did you suffer any pain or anything when they put their private parts in your mouth? A. I had the heart palpitation. Q. What? A. I had the heart palpitation. Q. You had heart palpitation? A. Yes. Q. You had that when they put their private parts in your mouth? A. Yes, I had it then. Q. You testified, did you not, that somebody was doing something to you behind, too? A. Yes. Q. Were they doing that while these other men were on top of you? A. They were doing that while Flores was on top of me. Q. While Flores was on top of you? A. Yes. Q. And when Flores was on top of you, Paul Bazáura had his private parts in your mouth? A. Yes. Q. And another man had you down on the other side? A. Yes. Q. Mr. Olivas had you down on the other side? A. Yes. Q. And another man was doing something with your rectum? A. With his hand, yes. Q. With his hand? A. Yes. Q. Now, who was holding your legs up in the air? A. I don't know."

The first identification of defendants took place in the general hospital. The testimony of the complaining witness in this respect is as follows: "Q. What day did you see these boys and identify them? A. When I was in the hospital. . . . A. Policemen brought them in and I pointed them out. Q. You pointed to all of them, did you? A. Yes. . . . Q. . . . . Which boys were there? A. All of these boys here. Q. All of them? A. *And some others, but they were the wrong fellows.* Q. You pointed them all out? A. Yes."

DeHara, however, testified as follows:

"Q. Now, as you left the cafe, did you see any of the defendants seated here, these five men, did you see any of these five men in that cafe when you left with Mrs. Johnson? A. No. Q. Did you know any of these men, or had you ever seen them before that night? A. No, sir."

While identification under the circumstances here detailed is not an impossibility, to us it does not have the ring of true metal.

The complaining witness testified that she washed up at Uroff's before she was taken to the county hospital. There is no evidence that she douched or of the manner in which she washed up. (It may be remarked parenthetically that no explanation was ever offered by complaining witness why the dirt was not washed out which was matted in the hair on the back of her head.) It cannot be said that such slight evidence explains the reason for the lack of an abundance of spermatozoa in the vaginal tract. In this connection the doctor who made the examination at the county hospital testified:

"Q. Well, say a large quantity, say after nine acts of sexual intercourse, in the woman you have examined, that certainly should leave some trace, should it not? A. Yes, sir. Q. And it would leave a great deal more of a trace than was left in this case? A. Yes, usually. Q. Now, if it is shown that she had one act of sexual intercourse prior to this time that was charged, that would account for the small amount of spermatozoa that you found, wouldn't it? A. Yes. Mr. Porter: That is all."

Attention should also be called to the fact that the complaining witness was finally compelled to admit that she had had sexual intercourse with the man with whom she was living on the evening of December 14th. In this connection she testified:

"Q. Prior to December the 15th, when had you seen Mr. Johnson? A. I don't remember that. Q. How is that? A. I don't remember. . . . Q. By Mr. Porter: When did you see him? A. I don't remember. Q. Would you say it was a week before that you had seen him? A. No, I seen him two weeks ago, I said. Q. I mean before December the 15th. Did you see him on December the 15th? A. I don't remember what date it was. Q. Did you see him on December 14th? A. Yes. Q. You saw Mr. Johnson on December the 14th?

A. The 14th, yes. . . . Q. . . . Did you have any relations with Mr. Johnson on December 14th, when you saw him? A. Yes, sir. Q. That was sexual relations? A. Yes, sir.''

The complaining witness was kept under observation at the county hospital for evidence of venereal disease or pregnancy. None was found. It is also significant that before the complaining witness left the cafe immediately prior to the alleged attack, she was invited by the Mexican barber (the same one who testified that he had had intercourse with her during the day) to stay at his place. In this respect she testified:

''Q. Didn't Manuel invite you across to his place? A. Yes, sir. Q. You say he invited you across to his place? A. Yes, sir. Q. I see. And did he say where his place was? A. Yes, sir. Q. And he pointed it out to you? A. Yes, sir. Q. From the beer parlor? A. Yes, sir. Q. I see. Now, did he tell you that you could stay there? . . . Q. Now, did this Russian at that time, did he tell you he was going home with you? A. Yes. Q. And you told Manuel you were going home with the Russian? A. I asked the Russian in front of him to take me home.''

It is also significant that according to the testimony of the complaining witness there were, in addition to the men who perpetrated the offenses charged, a group of others looking on. In this respect she testified:

''Q. Now, did you say you saw anybody sitting on the fence? A. Yes. Q. How many men were on the fence? A. I didn't count them. Q. About 15. A. Well, it looked like it to me. Q. Were they taking any part in this? A. Why, I don't think so. They were just looking on. Q. And did they help you get into this alley? The Court: Who do you mean by 'they'? Mr. Porter: The men on the fence. A. No, I don't think so. Q. And did they say anything when they were on this fence? A. They were laughing. Q. How close were you to these men on the fence? A. About four feet.''

█ Although the foregoing sordid tale is one that strains one's credulity, we are not prepared to say, as a matter of law, that the evidence of the witnesses for the prosecution was so inherently incredible that it cannot be accepted. (*Neilson* v. *Houle,* 200 Cal. 726 [254 Pac. 891]; *Estate of Jepson,* 178 Cal. 257, 259 [172 Pac. 1107]; *Austin* v. *Newton,*

46 Cal. App. 493, 497 [189 Pac. 471]; *Bohn* v. *Gruver*, 111 Cal. App. 386, 393 [295 Pac. 891].) We are, however, satisfied that when the evidence is "in such sharp conflict" as is the evidence in this case, and that when the evidence is such as *appears* to be incredible, that the rulings and instructions of the court became of grave consequence. (*People* v. *Jones*, 160 Cal. 358, 363 [117 Pac. 176].) We are also satisfied that on a record such as this "the utmost latitude compatible with our rules of evidence should have been permitted in the cross-examination of . . . a witness". (*People* v. *Williams*, 43 Cal. App. 60, 65, 66 [184 Pac. 498]; *People* v. *Degnen*, 70 Cal. App. 567 [234 Pac. 129]; *People* v. *Baldwin*, 117 Cal. 244 [49 Pac. 186]; *People* v. *Westlake*, 124 Cal. 452 [57 Pac. 465]; *People* v. *Ferdinand*, 194 Cal. 555 [229 Pac. 341].) A full cross-examination is not a matter of privilege; it is a matter of "absolute right". (*Heard* v. *United States*, 255 Fed. 829, 832; *Resurrection Gold Min. Co.* v. *Fortune G. M. Co.*, (C. C. A.) 129 Fed. 668; *Prout* v. *Bernards Land etc. Co.*, 77 N. J. L. 719 [25 L. R. A. (N. S.) 683, 73 Atl. 486].) ▮ We are also satisfied that "the record shows . . . instances where the cross-examination was held within boundaries more restricted than is usual under circumstances where the guilt of the defendant depends to a considerable extent, not only upon indirect evidence, but also upon the credibility of a single witness". (*People* v. *Williams, supra.*) ▮ The record in the instant case is replete with illustrations of objections sustained by the trial court to questions propounded by defense counsel, such objections being sustained on the ground that the questions had been asked and answered. While ceaseless repetition of the same question is to be avoided, there can be no doubt that counsel, when cross-examining a witness, may, under some circumstances and within reasonable bounds, ask the same question more than once without offending the rules pertaining to cross-examination.

▮ There are also numerous errors in the acceptance and rejection of evidence. During the cross-examination of the alleged victim, she was referred to her testimony given at the preliminary hearing. The following question was asked:

"And did you testify, 'Q. Calling your attention to around 11:00 o'clock that night, were you there with anyone else? A. Yes, I was with a girl that worked in the place. Q. Did

you have any conversation with any man there around 11:00 or 11:30? A. Yes, I did. Q. What man? A. Well, it was a Russian fellow, supposed to be outside. Q. Did you know his name? A. No, I never seen him before.' Did you make that statement? Mr. Leavy: I object to that as not impeaching. The Court: Objection sustained."

The objection was invalid and the ruling was error. Whether or not the reply tended to impeach the witness was a question for the jury to determine. Again the examination continued as follows:

"Q. By Mr. Porter: Now, at the preliminary hearing, on January 3rd, 1936, in the Municipal Court of the City of Los Angeles in Division 2, you testified there, did you not? A. Yes, sir. Q. I see. And at that time you were asked the question, 'Q. And calling your attention to around 11:00 o'clock that night, were you in there with anyone else? Were you asked that question? . . . A. I don't think so. Q. You don't think so? A. No.

"Mr. Leavy: The witness doesn't understand, if the Court please.

"The Court: To be rather frank, I do not understand the rather anomalous proceeding myself, to ask the witness if she was asked a question and then stop at the end of the question. I don't want to make any objections myself, but I am going to make the objection that this is incompetent, irrelevant and immaterial. Your question couldn't possibly tend to impeach anybody.

"Mr. Porter: Well, I will ask the question and then read the answer. I have a right to do that, all right.

"Q. You were asked the question, 'I call your attention to around 11:00 o'clock that night, were you in there with anyone else?' And to that did you make the following answer, 'Yes, I was with a girl that worked in that place.' Did you or did you not make that answer. A. Yes, sir.

"Mr. Leavy: Objected to as incompetent, irrelevant and immaterial and ask that the answer be stricken.

"The Court: The objection is sustained and the answer is stricken."

The interruption of the cross-examination by Mr. Leavy and the attitude and ruling of the court were error. It is not the question addressed to the witness, but the reply of the witness, which may or may not be impeaching evidence.

As to whether or not it tends to impeach is for the jury to determine. Furthermore, the questions were proper on cross-examination, even though they were not impeaching questions in a technical sense. Merely because a question starts like an impeaching question does not mean that it is or is not intended to be one. There is a marked difference between *laying the foundation for after-impeachment* of a witness and cross-examination of a witness. If the cross-examination is efficacious, it may eliminate the necessity of formal foundations and subsequent impeaching witnesses. (*People* v. *Jones,* 160 Cal. 358, 364 [117 Pac. 176].)

Again in the cross-examination of the same witness' testimony given at the preliminary examination, the following occurred: "Q. Now then, as to the question of, 'What man?' line 1, page 82, did you answer, 'Well, it was a Russian fellow, supposed to be outside.' Did you so testify? Mr. Leavy: I object to that as asked and answered and not impeachment. The Court: Sustained on the latter ground. Mr. Porter: This is in relation to the next question. If the Court please, I have to approach this. 'Q. Do you know his name? A. No, I never seen him before.' Did you so testify? Mr. Leavy: Objected to as asked and answered and not impeachment. The Court: Objection sustained."

Such examples occur frequently in the cross-examination of the complaining witness and of other witnesses for the prosecution. Another example illustrating how the cross-examination of the complaining witness was restricted by the court, is as follows: "The Court: Hasn't all of this been gone over? Mr. Porter: No, we did not go over that particular part. The Court: I am sorry, but my notes show that we did. As soon as she got up, as soon as the boys ran she got up and she tapped on the window in the alley and then called for help. Mr. Porter: But what I was trying to get at was this question about going through the gate. Q. You say you went through the gate? The Court: She has testified that she came out of this lot and knocked on the window. Mr. Porter: The idea is did she come through the gate? That is what I want to emphasize. The Court: Is there any way of getting out of that lot besides going through the gate? Mr. Porter: It will be developed in the testimony, your Honor. Q. Now, at about—you testified here in this court that you did not have any definite idea of time; that

there was no way for you to tell the time, is that right? A. Yes. Mr. Leavy: That is objected to as asked and answered. The Court: Sustained. Also, that form of question is improper. That is another reason that we have a daily transcript. If she did so testify it is in the transcript.''

During the cross-examination of the complaining witness on the subject of her identification of the defendants, the following episode occurred: ''Q. Did someone point them out to you? A. Policemen brought them in and I pointed them out. Q. You pointed to all of them, did you? A. Yes. The Court: I think that might be a little ambiguous; there is no testimony as to who was there. Q. By Mr. Porter: Which boys were there? A. All of these boys here. Q. All of them? A. And some others, but they were the wrong fellows. Q. You pointed them all out? A. Yes. The Court: Just a minute. You mean you pointed out *which ones were the ones and which ones were the wrong ones?* A. Yes, sir. Q. By Mr. Porter: Did you say at that time that some boys were not there? A. Yes. Q. Which boys would you say were not there? A. They brought some there that I pointed out as the fellows that were there, but they wasn't the ones. Q. You pointed them out as the fellows that were there? A. Yes. Q. But they were not the ones that were there? A. No. Mr. Leavy: That is objected to as calling for a conclusion of the witness. The Court: *Well, let's straighten that out.* Q. About how many boys did they bring into the hospital? A. About five. Q. Was it the same five or— A. Some other boys. Q. Some of these boys and some others? A. Yes. Q. And did you point somebody out? A. Yes, sir. Q. Did you point out somebody as being the boys that were there that night in the alley? A. Yes. Q. Who did you point out in this alley? A. Some of these boys here. Q. What did you say about the other boys? A. *I said they were there, but they were not.* Q. You so testified, but they were not? A. Yes, sir. Q. How did that happen? A. I thought they were and afterwards I found out. The Court: You may proceed.''

The court's interference with the cross-examination was unnecessary and the court's statement, ''You mean you pointed out which ones were the ones and which ones were the wrong ones?'' was entirely unwarranted and not in accordance with the fact. The court's expression, ''Well, let's

straighten that out" was also an unwarranted invasion of the cross-examination of the witness in a case where the inquiry was vital. Furthermore, the testimony of the complaining witness in answer to the court's questions demonstrated that there was nothing to "straighten out", and that the first answer of the complaining witness, "And some others but they were the wrong fellows," was exactly what she did and exactly what she meant.

■ Certain officers testified to alleged confessions of some of the defendants. In this connection, it was brought out that one Bazaura was present at the commission of the alleged offense and participated therein, but was not prosecuted. The defendants were confronted with Bazaura by the officers. Questions were asked Bazaura, the replies to which involved certain of the defendants, and in this connection defendants' counsel asked leave to cross-examine the officers on *voir dire*. The officer was asked: "Q. Now, prior to that, you had examined Mr. Bazaura in the City Jail, had you not? A. Yes, he had been interviewed several times. Q. And when you talked to him in the city jail, did you put your foot on top of his foot and twist his arm— The Court: Just a minute, Mr. Porter. We are not trying Mr. Bazaura. He is not one of the defendants. Your *voir dire* is limited to the free and voluntary character of any statement made on the part of the defendant. Mr. Porter: All right."

This was error. Defendants' counsel had the right to go into the question of any means resorted to by the officers to wring an involuntary confession from the defendants. To make a confession involuntary it is not essential that force or violence be used on the defendant who makes the confession. If in his presence, or with his knowledge, such force or violence has been used on a co-defendant or a third person who is supposed to have knowledge of the crime, or even if relatives are intimidated, such conduct is sufficient, and is pertinent evidence. ■ Moreover, the court, during the examination of this witness, instructed the jury that the manner and actions of the defendants in the face of accusatory statements are admissible as *tending to show acquiescence in the transaction*. The failure of the defendant to deny an accusatory statement and his manner and conduct are admissible as a circumstance for the jury's consideration, but it is for the jury to determine the effect of such evidence. It

was error for the court to instruct the jury that such evidence was admitted as *tending to show acquiescence in the transaction.*

The accusatory statement of the witness Bazaura involving defendant Salazar was denied by Salazar at the time. Such evidence, therefore, was inadmissible as against Salazar and should have been stricken and the jury so instructed.

Prejudice is a matter of degree. An incident in the light of one record might not necessarily be prejudicial and reversible error, but a similar incident in the light of another record might be highly prejudicial. The record presented herein is of such character that relatively slight error could have easily resulted in a miscarriage of justice, and there is no doubt in our minds that there has been a miscarriage of justice. (*Hirshfeld* v. *Dana,* 193 Cal. 142 [223 Pac. 451]; *Adkins* v. *Brett,* 184 Cal. 252, 261 [193 Pac. 251]; *Valentine* v. *Provident Mutual Life Ins. Co.,* 12 Cal. App. (2d) 616 [55 Pac. (2d) 1243].)

Because of all of the foregoing, we feel that the judgments and the orders denying motion for a new trial as to each of the defendants should be, and they and each of them are, reversed. The testimony being "so improbable as to challenge one's credulity" (*People* v. *Pantages,* 212 Cal. 237, 278 [297 Pac. 890]), we feel constrained to say that the trial court and the district attorney should give the matter mature and analytical consideration before a new trial is undertaken.

Houser, P. J., and Doran, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 10, 1936.