[Crim. No. 2449.   Third Dist.   Jan. 19, 1954.]

THE PEOPLE, Respondent, v. CHARLES H. BROPHY, Appellant.

Lawrence Edwards and Alvan E. Norris for Appellant.

Edmund G. Brown, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

SCHOTTKY, J.—Appellant was charged by information with two violations of section 245 of the Penal Code, to wit: assault with a deadly weapon. The assaults were alleged to have been committed with a pistol upon the persons of Leon Calkins (count 1) and James Shirley (count 2) on October 10, 1952. Following a trial, appellant was found guilty on count 2 and not guilty on count 1. Appellant's motion for a new trial was denied and judgment was pronounced sentencing appellant to imprisonment in the state prison. This appeal is from the said judgment and from the order denying the motion for a new trial.

Appellant does not question the sufficiency of the evidence to support the judgment, but urges a number of grounds for a reversal of the judgment and order. Before discussing these contentions of appellant we shall give a brief summary of the evidence as shown by the record.

At the time of the alleged assaults, both appellant and the complaining witnesses, Leon Calkins and James Shirley, were doing hauling for Claude Woods, a road construction contractor. Appellant operated his own truck and Calkins and Shirley were working for Calkins' brother, Les Calkins, who owned several trucks. On October 10, 1952, around noon or shortly thereafter, appellant was waiting to load his truck at Claude Woods' gravel pit near Clements, about 11 miles northeast of Lodi, when he and Les Calkins got into an argument, apparently about the conduct of Calkins' drivers. Les Calkins summoned his brother Leon who was near by. There is some dispute as to what was said between Leon and appellant, but in any event Leon told appellant to take off his glasses if he wanted to fight. Appellant then went over to his truck and returned with a hammer, whereupon the Calkins brothers left.

About 5:30 p. m. that same afternoon, appellant returned to the gravel pit property, driving there in a two-door Oldsmobile car. The pit proper was an excavation some 6 to 10 feet lower than the surrounding land. There was a scale house on the upper level of the property, a short distance from the edge of the pit. Apparently it was not necessary to drive into or through the pit in order to reach the scale house from the highway. Les Calkins maintained a gas pump and other facilities in the pit for servicing his trucks, and Leon Calkins, James Shirley and Herb Ramer (another of Les Calkins' drivers) were in the pit working on trucks when appellant drove up. This was after regular working hours and no one else was present.

The combined testimony of Leon Calkins, Shirley and Ramer shows the following: Appellant drove into the pit, stopped his car some 50 to 60 feet from them and motioned for someone, apparently Calkins, to come over to the car, saying, "You're the one I want," or words to that effect. Calkins started toward the car, whereupon appellant turned the car around, apparently said something else and drove out of the pit, stopping the car between the scale house and the edge of the pit. Appellant then got out of the car and

cursed Calkins who was about 40 feet away and down in the pit. Calkins and appellant threw rocks at each other; Calkins was hit once, on the leg, and he hit the door of appellant's car at least once. Appellant admitted picking up the first rock. During this rock fight appellant went to the car, opened the door, reached down by the seat and came out with a .32 caliber automatic pistol which he fired several times at Calkins. Five empty shell cases were found in the area where appellant stood. At the first shot, Calkins threw himself to the ground, near a wrecked truck. Ramer saw bullets hit the sand close to Calkins, and there were two marks on the truck frame which could have been made by bullets hitting the frame. According to Calkins and Shirley, appellant then came down the embankment toward them, carrying the pistol. At this point, Calkins jumped to his feet and ran. He did not see what happened after that, but he heard another shot. Ramer was hiding behind a truck and he did not see appellant come down into the pit, but he heard him talk to Shirley and he later got a glimpse of him in the pit and saw that he had a pistol.

Shirley testified that appellant then pointed the pistol at him and threatened to kill him. Shirley was about 20 feet from appellant at the time and he told appellant that he (Shirley) had not done anything to him. Ramer, who was in a position to see Shirley but could not see appellant, heard appellant's threat to Shirley and the latter's reply, and Ramer also testified that Shirley covered his face with his hands and pleaded with appellant not to shoot. Shirley said he heard the gun "snap" and he "dove" for a truck. Both Shirley and Ramer then heard a shot fired, and they stayed behind trucks until after appellant left.

Appellant's testimony as to what transpired at the pit is quite different. He said that he went out to the plant to pick up a check at the scale house, that he parked his car between the scale house and the edge of the pit and that when he left the car to go to the scale house he saw Calkins, Shirley and Ramer down in the pit. Calkins hurled epithets at him and the three men started to advance toward him. He picked up a rock and Calkins then threw rocks at him. During this rock barrage appellant tried to get into his car from the right side but the door was locked, so he went around to the left side and got into the car. He was unable to find the car keys. Meanwhile Calkins kept advancing toward him; the other men had disappeared and appellant

thought they were going up to the road to cut him off so that he could not drive out. It was then that appellant reached under the car seat, got the pistol and fired five shots, two of them aimed at the ground in the vicinity of Calkins and the other three fired over Calkins' head. Calkins was then about 35 feet from appellant. Appellant stated he had heard that Calkins was a good fighter, that he (appellant) was afraid they were going to beat him up, and that he fired the gun to stop them. He denied that he went down into the pit, or that he ever pointed the gun at Shirley or threatened him in any way. He admitted that he had never had any trouble with Shirley.

Appellant returned to his trailer home in Lodi, and Calkins, Shirley and Ramer also returned to Lodi where they notified the sheriff's office of the shooting. Two officers made an investigation and then went to appellant's trailer where they questioned him. Appellant denied knowledge of the shooting and also denied that he had or owned a pistol, although the gun was then lying on the bed in an adjoining room. He made similar denials when he was questioned later by the district attorney. Appellant took the gun to Long Beach and left it with his brother there. The gun was located before the trial and appellant admitted, at the trial, that he owned the gun and had fired the five shots evidenced by the empty shell cases found near the gravel pit. However, no bullet, empty shell case or ejected cartridge was found in the pit where appellant was said to have been standing when he assaulted Shirley. The pit surface at this location was composed of sand and gravel.

Appellant's first contention is that the court erred in refusing, as "having no application," the following instruction offered by appellant:

"When and if you should find that it was within the power of a party to produce stronger and more satisfactory evidence than that which was offered on a material point, you should view with distrust any weaker and less satisfactory evidence actually offered by him on that point."

Appellant contends that if he had been in the gravel pit and snapped the gun at Shirley (the gun presumably misfiring) and later fired the gun, as stated by Shirley, there should have been an unexpended cartridge and an empty shell case in the vicinity. There was evidence that the empty shell cases were ejected automatically upon firing, and that in case of a misfire the unexpended cartridge was ejected

manually in order to load the gun with a fresh cartridge. The area was searched by the investigating officers, the Calkins brothers and possibly Shirley soon after the shooting and they found the five empty shell cases on the upper level where appellant stood when he fired at Leon Calkins. Ramer and Leon Calkins also searched the area the next morning. The prosecution failed to produce either the unexpended cartridge or the empty shell case, and appellant's request for the instruction is based on this fact.

While it is true that section 2061, subdivision 7, of the Code of Civil Procedure provides that the said offered instruction should be given to the jury on all proper occasions, there is, of course, no showing that it was within the prosecution's power to produce the unexpended cartridge and/or empty shell case. These articles may have been trampled into the sand by the first search party, which searched the pit after dark, using flashlights, or appellant himself may have picked them up before he left the pit. It is a reasonable inference that if the prosecution could have found this evidence it would have used it. Furthermore, the testimony of Shirley, an eyewitness to the assault, must be considered stronger and more satisfactory evidence than the finding of a cartridge or shell case at the scene. We are, therefore, unable to agree with appellant's contention that the court erred in refusing to give said instruction.

■ Appellant next contends that the court erred in refusing to give the following two instructions:

"The testimony of one witness worthy of belief is sufficient for the proof of any fact and would justify a verdict in accordance with such testimony, even if a number of witnesses have testified to the contrary, if from the whole case, considering the credibility of witnesses and after weighing the various factors of evidence, you should believe that there is a balance of probability pointing to the accuracy and honesty of the one witness."

"You are not bound to decide in conformity with the testimony of a number of witnesses, who were present at the scene of alleged crime, which does not produce conviction in your mind, as against the declarations of a lesser number or a presumption or other evidence which appeals to your mind with more convincing force. This rule of law does not mean that you are at liberty to disregard the testimony of the greater number of witnesses merely from caprice or prejudice, or from a desire to favor one side as against the

other. It does mean that you are not to decide an issue by the simple process of counting the number of witnesses who have testified on the opposing sides. It means that the final test is not in the relative number of witnesses, but in the relative convincing force of the evidence."

While these instructions are usually given to the jury and might well have been given in the instant case, we do not believe that appellant was prejudiced by the court's refusal to give them. For said instructions merely state a commonplace proposition within the general knowledge of the jurors, namely, that the testimony of every witness must be given the weight to which the jurors believe it to be entitled. Furthermore, the court did give the following instructions:

"You are the sole judges of the value and effect of the evidence addressed to you. However, this power is not an arbitrary one, but it must be exercised with legal discretion and in accordance with the rules of evidence."

"A witness is presumed to speak the truth. This presumption, however, may be repelled by the manner in which he testifies, by the character of his testimony, or his motives, or by contradictory evidence, and the jury are the exclusive judges of his or her credibility."

". . . The defendant in a criminal action is presumed to be innocent at all stages of the trial and even during your deliberations in the jury room, until the contrary is proved. This presumption places the burden on the people to establish his guilt beyond a reasonable doubt and to a moral certainty, and failing to do, he is entitled to an acquittal."

Appellant next contends that the court erred in refusing the following instruction requested by him:

"Proof sufficient to convict in this case must exclude every reasonable hypothesis other than that of guilt. If after considering all the evidence you believe there are two reasonable hypotheses, one consistent with the guilt of the defendant, and the other equally consistent with his innocence, I instruct you that it is your duty to acquit him."

The court's notation on the proposed instruction shows that it was rejected because there was no circumstantial evidence in the case. Appellant contends that there was such evidence and that the requested instruction should have been given or the court should otherwise have instructed the jury on the rules of law applicable to circumstantial evidence. However, it appears from the record that appellant's convic-

tion on the second count rests primarily upon direct evidence, and that circumstantial evidence was only incidental or corroborative. In such a case the court is not required to instruct the jury regarding circumstantial evidence. (*People* v. *Klinkenberg,* 90 Cal.App.2d 608, 632 [204 P.2d 47, 613]; *People* v. *Dargo,* 93 Cal.App.2d 193, 198 [207 P.2d 1091].)

While the requested instruction might well have been given we do not believe that its refusal was prejudicial error. Particularly applicable to appellant's contention is the following language of this court in *People* v. *Corlett,* 67 Cal. App.2d 33, at page 47 [153 P.2d 595, 964]:

"The court did not err in failing to instruct the jury, on its own initiative, upon the subject of circumstantial evidence. The jury was fully and fairly instructed that the defendant was presumed to be innocent and that the burden of proof of every essential element of the crime rested upon the prosecution to establish his guilt beyond a reasonable doubt. The jury was told that the burden did not shift from the prosecution on account of the defendant's claim that he shot Stafford in self-defense, or otherwise. This is not a circumstantial case. The proof of the assault itself was dependent almost entirely upon the direct evidence of the defendant and the prosecuting witness. Both were examined at great length. There was no occasion to give to the jury an instruction on the subject of circumstantial evidence. The instructions which were given correctly informed the jury upon all of the essential elements of the crime with which the defendant was charged and upon his theory of defense upon which the case was tried. The degree of proof required to support a verdict of conviction applies alike to both circumstantial and direct evidence. (*People* v. *Bailey,* 82 Cal.App. 700, 706 [256 P. 281]; 8 Cal.Jur. 191, § 266.) In the case last cited it is said, 'The law makes no distinction between circumstantial evidence and direct evidence in the degree of proof required for conviction.' The prosecution relied, in this case, on direct evidence. Whatever circumstances that appear in evidence were merely incidental to or corroborative of the direct evidence of the eyewitnesses to the affray. It has been repeatedly held it is not error for the court -to refuse to instruct juries upon the subject of circumstantial evidence where the cases depend chiefly on direct evidence. (*People* v. *Lapara,* 181 Cal. 66, 70 [183 P. 545]; *People* v. *Lonnen,* 139 Cal. 634 [73 P. 586]; *People* v. *Harvey,* 109 Cal.App. 111 [292 P. 654]; *People* v. *De Voe,*

123 Cal.App. 233 [11 P.2d 26]; *People* v. *Williams,* 134 Cal. App. 232 [25 P.2d 259]; 8 Cal.Jur. 369, § 404.)''

Appellant next contends that the court erred in refusing to admit in evidence the testimony of witnesses Wolfe and Overton as to the bad reputation of Leon Calkins for peace and quiet. Respondent argues that this testimony was admissible, if at all, only as to the first count, which charged an assault upon Calkins, and that inasmuch as appellant was acquitted on the first count, no possible prejudice could have resulted to him. Appellant in reply to this argument asserts that it was appellant's theory and evidence that Calkins, Ramer and Shirley were all advancing toward him and that Calkins admitted throwing rocks at him. He points to the testimony of Ramer that the three of them were ''advancing to get a chance to get to even things up.'' Appellant argues that it was fairly inferable from the evidence that Calkins and Shirley were acting jointly with a common design and purpose, and, therefore, evidence as to Calkins' bad reputation for peace and quiet was admissible.

It is clear that the chief defense of appellant was a plea of self-defense, and that it was the theory and testimony of appellant that Calkins and Shirley and Ramer were the aggressors, although it must be stated that the evidence preponderated heavily against this theory. However, in a criminal case the line should not be so sharply drawn as to exclude evidence which might have considerable weight if defendant's theory and testimony are believed by the jury.

The general rule is well expressed in 64 A.L.R. at pages 1029, 1030, as follows:

''The rule is supported by many authorities that on a trial for homicide, or for an assault and battery, the defendant, after laying a proper foundation by evidence tending to show that, in committing the homicide or assault, he acted in self-defense, may introduce evidence of the turbulent and dangerous character of the deceased or party assaulted. While the deliberate, unprovoked killing of a human being cannot in any measure be justified by the fact that he bore the reputation of a turbulent and violent person, the law recognizes the well-established fact in human experience that the known reputation or character of an assailant as to violence and turbulence has a very material bearing on the degree and nature of the apprehension of danger on the part of a person assaulted; also that one who is turbulent and violent may the more readily provoke or assume the aggressive in

an encounter. Hence, as bearing on these issues, where a proper foundation has been laid, it is conclusively established in almost all jurisdictions that evidence of the turbulent and dangerous character of the victim of an assault or homicide is admissible." (See, also, *People* v. *Keys*, 62 Cal.App.2d 903, 912 [145 P.2d 589]; *People* v. *Lamar*, 148 Cal. 564, 573 [83 P. 993].)

██ We believe that in the instant case the offered evidence as to the reputation of Calkins should have been admitted, but in view of the fact that the evidence preponderated so strongly against appellant's theory of self-defense, and the further fact that appellant was acquitted on the charge that he assaulted Calkins, we are not prepared to hold that its exclusion was reversible error.

Appellant also complains that the trial court unduly restricted his cross-examination of the prosecution's witnesses Ramer and Officer Phillips. Phillips was one of the investigating officers and he interrogated Ramer during the investigation made on the evening of the shooting. Ramer had testified on direct examination that he had told his story to the police (Officers Phillips and Poulos). Upon his cross-examination Ramer first testified that he had told the officers everything he knew about the case. He was then asked if he had told either officer about the rock-throwing by appellant or Leon Calkins that night, and Ramer replied that he did not remember. Appellant contends that the court erred in sustaining respondent's objection to the following question asked by appellant's counsel on the cross-examination of Officer Phillips:

"During your investigation of the matter, either at Lodi or while you were out at the pit, did any of the parties you have mentioned state to you anything about rock-throwing?"

Appellant argues that he was seeking to elicit whether, during the investigation the night of the alleged crime, the said witnesses had mentioned (1) the rock-throwing episode which provoked the argument, or (2) that the defendant started into the pit prior to the shooting (a fact which the defendant emphatically denied), from which the inference could be drawn that the three were contriving the story or at least withheld pertinent facts when first talking to the police. Appellant contends that he had laid the proper foundation for impeachment in his questioning of both Calkins and Ramer, and that he had the right to determine

through the officer involved whether said facts were disclosed or asked about. He cites Wigmore on Evidence, 3d edition, volume 3, section 1042, where it is stated:

"A *failure to assert* a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of the fact. This is conceded as a general principle of Evidence (*post,* sec. 1071). There may be explanations, indicating that the person had in truth no belief of that tenor; but the conduct is 'prima facie' an inconsistency.

"There are several common classes of cases:

"(1) Omissions *in legal proceedings* to assert what would naturally have been asserted under the circumstances.

"(2) Omissions to assert anything, or to speak with such detail or positiveness, *when formerly narrating,* on the stand or elsewhere, the matter now dealt with."

In view of the fact that there was admittedly a rock-throwing incident between Leon Calkins and appellant prior to the alleged assaults, we believe that it was proper for appellant to inquire of Officer Phillips whether the witnesses who claimed to have seen the entire affray had mentioned the rock-throwing when he had interrogated them about the matter. The failure to tell about the rock-throwing might, as argued by appellant, reasonably cause the jury to infer that the witnesses Shirley, Calkins and Ramer did not disclose facts unfavorable to themselves to the investigating officer, and were trying to show appellant in the worst possible light, indicating prejudice against appellant, and that it might cause the jury to doubt other parts of the testimony of said witnesses.

The following language from *People* v. *Goldberg,* 110 Cal. App.2d 17, at page 26 [242 P.2d 116], is quite applicable here:

". . . Although the counsel for appellant. called direct attention to testimony on the prior trial that was not impeaching nor contradictory to that given on the present trial, it should have been apparent that what he was trying to show was that Patricia had testified on the present trial to a statement by appellant that she had not mentioned on the prior trial. That was a proper subject of cross-examination. Cross-examination is not a matter of privilege, but of right. (*People* v. *Hume,* 56 Cal.App.2d 262 [132 P.2d 52]; *People* v. *Flores,* 15 Cal.App.2d 385 [59 P.2d 517]; *People* v. *Ferdinand,* 194 Cal. 555 [229 P. 341].)"

While we believe that the trial court should have permitted the question asked of Officer Phillips to be answered, in

view of the fact that Shirley admittedly took no part in the rock-throwing incident and that appellant was acquitted as to the assault alleged against Calkins, we do not believe that the error was prejudicial.

Appellant next complains that the trial court erred in excluding testimony by his witness Titherington as to appellant's proficiency as a marksman. The record shows that appellant elicited from Titherington testimony tending strongly to show that he was an expert both as to ballistics and in the use and accuracy of small arms, and also an expert on marksmanship. He then endeavored to show by the witness that he had tested the marksmanship of appellant with a similar weapon at the scene of the alleged assault and to prove by the witness that appellant was a good shot. The objection was made that the proposed evidence was incompetent, irrelevant and immaterial, and the trial court sustained the objection, stating that he could ''see no theory upon which it could be admissible.''

In support of the court's ruling respondent argues that ''Even if he [Titherington] had been qualified as an expert witness as to the shooting ability of persons engaged in marksmanship contests, that would not support his qualification to give his opinion as to the marksmanship of an excited, frightened man, who was angry and who was pursuing unarmed men with the intention of shooting them, as was the situation presented in this case. The record discloses that as or before the defendant fired the last shot, the victim, James Shirley, had run some 30 feet and dived behind a truck. Under such circumstances, even a good shot could not be expected to achieve his aim with a short-barreled, automatic .32 calibre pistol.''

Clearly this argument of respondent goes to the weight of the evidence and not to its admissibility. Its weight was a matter for the jury to determine. The fact that appellant was a good marksman and that none of the persons alleged to have been shot at were hit at the comparatively short distances that they were from appellant was evidence that the jury would have a right to consider.

The final contention of appellant is that the prosecuting attorney was guilty of prejudicial misconduct in his final argument to the jury. Shirley had testified that they dug up one of the bullets which had been fired into the dirt near where Calkins was lying. Presumably this bullet was from one of the five cartridges fired by appellant from the upper

level. There was testimony that appellant came down into the pit and fired a sixth shot in connection with the alleged assault upon Shirley. Ramer, Leon Calkins and Officer Phillips had testified on cross-examination that they had not found any unexpended shell or shell case in the pit area where appellant was said to have been when the sixth shot was fired. Both Calkins and Phillips mentioned that the area was covered with loose sand.

In his argument to the jury appellant's counsel pointed out that if appellant had been in the pit and snapped the pistol at Shirley (presumably misfiring) and then fired the sixth shot, the unexpended cartridge and the empty shell case would have been ejected, and counsel stressed the fact that no such evidence was found. Later in his argument he said:

"Now, they talk about some bullets—pardon me. Mr. Shirley, I believe, said down here was where he picked up a bullet somewhere. He said down here somewhere. Now, where is the bullet? I fully expected him, after he got that, to come up here with it. If they had it it's their duty to produce it. Where is this bullet and where did he find it? They tell you in the next breath this was deep sand, you can't even find one in deep sand. Can't even find a foot mark and a footprint in it. He might have seen something like it, that's possible, but he said he kicked around there and picked up this bullet. I kept waiting and waiting for that bullet to show up. I never did see it. It was never offered in evidence."

The prosecuting attorney replied to this in his closing argument, as follows:

"Now, quite a bit has been said about the testimony of Mr. Shirley who found the bullets. Where is that bullet? There is the bullet. (Showing to jury.) Mr. Edwards [appellant's counsel] knows it as well as I do. That bullet's so flattened——"

Whereupon, appellant's counsel objected that the prosecution was going outside the evidence in showing the bullet to the jury. The court sustained the objection and instructed the jury to disregard any statement in reference to the subject. Later, during its deliberations, the jury returned to the courtroom and expressed confusion regarding the two counts. The court explained the counts to them, whereupon one juror said that there was a part of the testimony that the jury could not agree upon. Either the same or another juror then said that there was a great deal of evidence that appellant

did fire one shot at Shirley, and the court told the jurors that that was a matter for them to decide. A juror then remarked: "That is, the shell that did not explode apparently," and the court again said that that was a question for the jury.

We believe that the displaying to the jury of the bullet which had not been introduced in evidence, with the accompanying remark, was misconduct of the grossest sort, and that it was so highly prejudicial that no admonition of the trial judge to disregard it could erase from the minds of the jurors the undoubted electric effect of the production of the bullet and the remarks of the prosecutor in response to the argument of appellant's counsel. Misconduct of a prosecuting attorney in making remarks not warranted by the evidence cannot be justified even though they may be made in reply to those made by appellant's counsel. (*People* v. *Kirkes,* 39 Cal.2d 719, 725 [249 P.2d 1].) It is impossible to tell whether the jury understood that the bullet produced by the prosecutor came from one of the five shots fired from the upper level or from a sixth shot fired in the pit during the assault on Shirley. The evidence was conflicting as to whether appellant went into the pit and fired the sixth shot; he testified that he did not. If the prosecution had offered in evidence the bullet from the sixth shot, it would have controverted appellant's testimony, but not having offered it it was highly improper and extremely prejudicial.

What was said in the recent case of *People* v. *Talle,* 111 Cal.App.2d 650 [245 P.2d 633], may well be repeated here. The court said, at page 677:

"The argument of the district attorney, particularly his closing argument, comes from an official representative of the People. As such, it does, and it should, carry great weight. It must, therefore, be reasonably objective. It is no answer to state that defense counsel also used questionable tactics during the trial and therefore the district attorney was entitled to retaliate. Defense counsel and the prosecuting officials do not stand as equals before the jury. Defense counsel are known to be advocates for the defense. The prosecuting attorneys are government officials and clothed with the dignity and prestige of their office. What they say to the jury is necessarily weighted with that prestige. It is their duty to see to it that those accused of crime are afforded a fair trial. The applicable rule was admirably stated in *Berger* v. *United States,* 295 U.S. 78, 88 [55 S.Ct. 629, 79

L.Ed. 1314], quoted with approval in *Viereck* v. *United States,* 318 U.S. 236, 248 [63 S.Ct. 561, 87 L.Ed. 734] : ' ' "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the two-fold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." '

"District attorneys are, of course, to be commended for investigating crime and in prosecuting with vigor, those accused of crime. But prosecutive zeal and honesty in belief of guilt are not a substitute for the orderly, lawful and constitutional processes and guarantees."

▮ Respondent concedes that the production of the bullet by the prosecution was erroneous and was misconduct but argues that, in view of the fact that the court admonished the jury to disregard it, prejudice cannot be presumed. Respondent also argues that the evidence of appellant's guilt was so overwhelming that any errors committed would fall within the curative provisions of article VI, section 4½, of the California Constitution. We do not agree with either of these contentions. The evidence was not so overwhelming as to justify or excuse the flagrant misconduct of the prosecution. In our opinion the court should have severely reprimanded the prosecutor and declared a mistrial. But the trial court not having done so it is the duty of an appellate tribunal to reverse the judgment, for the error complained of is of such a nature that article VI, section 4½, of the Constitution cannot save the conviction.

The judgment and order are reversed and a new trial ordered.

Peek, J., and Paulsen, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.