## THE PEOPLE *v.* WILLIAMS.

WILLIAMS and Blake indicted for murder of Blanchard, and Williams on trial. Testimony for prosecution mostly circumstantial, aside from testimony of Blake, who said, among other things: "I went out with Williams the night of the death of Blanchard, and I know about the killing of Blanchard. I was with Williams the night when the murder was committed; it was a pick handle the murder was committed with. We started from Williams' house. We went across Williams' pasture, near the blacksmith shop, down across the field to Mahon's fence, and waited there awhile till he, Blanchard, came up, when Williams jumped out from the fence and struck him three or four times. Williams then stepped back from the body. We stopped in the ditch for a half or three-quarters of an hour. The first fence we stopped by was a board fence. These are the boots; have worn them since June. Williams had on a pair of boots with brands in them; these look like the boots; the boots Williams had on he put in the well the next day, as he told me   Williams asked me three or four times to go with him and I refused him, and finally consented. He said he wanted to go and thrash Blanchard. I believe the cause was about property.  At the time of starting I did not know he intended to kill Blanchard. The pick handle had been in the cellar since I lived at Williams'." After this testimony, witness was asked by defense on cross-examination—"Did you see old man Blanchard at Buckner's in presence of Putney and Marion Samples a few days before he was killed?" Answer: "Yes." He was then asked: "Did you not then and there state that you intended to kill Blanchard?" Objected to as improper on cross-examination and as irrelevant, and ruled out: *Held,* that the question was proper; that the testimony was admissible as tending to show a contradiction in the witness' statement in this; that he represented he had gone at the instance and by the mere persuasion of Williams, and this proof of hostility and threats to kill the deceased tended to show a motive personal to himself, and a purpose of his own volition to perpetrate the murder.

*Held, further,* that the proof of threats by Blake to kill, followed by an actual homicide, was *some* evidence that Blake himself did the deed, and therefore contradictory of his statement that Williams did it; or at least that the witness assisted actively in it, in which event the jury would probably regard his testimony more unfavorably than if he were merely passive, and were present by the persuasion of Williams, not expecting a homicide, but only an assault, and not meaning to aid in a murder.

On the cross-examination of a witness situated as this one was, the utmost latitude justified by law in any case should be permitted.

There being no direct proof that the killing was committed within Sacramento county where defendant was indicted, but simply the testimony of the Coroner of said county, who held the inquest, that the body was found in "San Joaquin township, about fourteen miles from the city of Sacramento;" defendant raised the point that the venue was not proved, and that the Court will indulge in no presumptions upon this subject. The Supreme Court intimate an opinion against defendant's position, but decline passing on the point.

In criminal cases Courts have no power to affirm a judgment merely because the Judges think that upon the merits the judgment is right. If there be error in the proceedings, it is presumed to be injurious to the prisoner, and generally he is entitled to a reversal—having a constitutional right to stand upon strict law.

Suggested, that whenever the evidence offered by the defense in a criminal case is not plainly inadmissible, it is better to admit it rather than run the risk of a reversal of the judgment for error in excluding it, w . en probably it would not, if admitted, affect the case in the minds of the jui y

Appeal from the Sixth District Court.

Williams and Blake were indicted for the murder of Blanchard —Williams alone being on trial. The prosecution proved that the body of Blanchard was found in a field near a ditch and road leading through the field to the house of deceased; that the head was nearly destroyed and the skull scattered around in pieces; that certain boot tracks, leading across the road and also from the body to the ditch, marked by large nails, etc., were found; and also appearances indicating that two men had been sitting for a considerable time in the ditch; that the body being found on Sunday morning, the killing being after eight o'clock of the night before, several persons went to defendant's house, about a half mile distant, to search out matters; that defendant, on being told of the murder, that he was suspected, and asked what boots he wore that morning, made various replies—at first said he wore shoes, etc., but finally went to his cellar, and selecting one of several pairs of old boots, said they were the boots he wore that morning, but on examination the boots were found to be mildewed on the inside, etc., showing that they had not been worn for some time. A similar reply and result followed as to some boots in the granary. After awhile a pair of heavy boots, with large nails in the soles, were found in the well of defendant, and these boots fitted the tracks found near the body of deceased. Blake, codefendant, on being asked where the boots were, said: " Don't be so saucy, I do not want to tell all I know before folks," and subsequently pointed out the well as the place to examine. Having proved these and other circumstances tending to show defendant to have committed or been connected with the murder, the prosecution called Blake to the stand, and he testi-

People *v.* Williams.

fied, among other things, as stated in the opinion of the Court. On cross-examination he also stated, before the questions recited in the opinion were put, that he struck Blanchard once.

The point as to the failure to prove the killing to have been committed in Sacramento county, was on this state of facts. There was no direct proof that the place where the body was found was within the county. The Coroner of the county, who held the inquest, stated that he found the body in San Joaquin township, about fourteen miles from the city of Sacramento; and it appeared that the *locus* was near "the Stockton road," and that all the proceedings relative to the death of deceased were conducted by officers of Sacramento county.

Defendant being convicted of murder, appeals.

*N. Greene Curtis and Geo. R. Moore*, for Appellant.

1. Defendant had a right to ask the witness Blake, on cross-examination, whether he had not threatened to kill Blanchard. Such testimony was good both to impeach Blake and to show his hostility to Blanchard, and his motive for committing the murder. (*People v. Arnold*, 15 Cal. 476.)

2. There is no proof that the crime was committed within the jurisdiction of the Court. The fact that it was committed within fourteen miles from the city of Sacramento does not aid; because if the Court is to take any judicial notice upon this question, it will take notice that such distance will take you out of the county in three different directions. But the Court will not take judicial notice that a particular spot is within a particular county. (Shareswood's Notes to Starkie's Ev. 658, 660; *R.* v. *Sharpe*, 8 C. & P. 436; *Deybell's case*, 4 B. & Ald. 243; *R.* v. *Bourne*, Burr, S. C. 42; 2 Inst. 557; *R.* v. *Greep*, Comb. 459; *Brown* v. *Thompson*, 2 Q. B. 789; *Humphrey* v. *Budd*, 9 D. P. & C. 1000; *R.* v. *Sympson*, 2 Ld. Raym. 1379.)

*Thos. H. Williams*, Attorney General, for Respondent.

1. The evidence sought on the cross-examination of Blake was immaterial. If admitted, it would only have *tended* to prove what was already conceded, to wit: that Blake murdered Blanchard.

2. As to the venue, it was sufficiently proven; it was, as the witnesses state, on the Stockton road in San Joaquin township, fourteen miles from Sacramento city. The Court will take notice of facts appearing on the official map of the State. A point on an air line from Sacramento city to Stockton, fourteen miles from the former, will fall within Sacramento county; and by the *road* between those cities, the point will be further within said county.

BALDWIN, J. delivered the opinion of the Court—FIELD, C. J. and COPE, J. concurring.

The defendant was convicted of murder in the first degree, and appeals from the judgment. The errors assigned are: 1st, that the Court erred in refusing to permit certain questions to be put, on cross-examination, to one Blake, a participator in the crime, who was examined as a witness on the trial. It seems that the testimony, apart from the evidence of Blake, was mostly circumstantial. The testimony of Blake connected the defendant by direct proof with the homicide. In order to understand the point made and our decision upon it, it will be necessary to state some parts of the testimony of Blake. We extract from the record: "I went out with Williams the night of the death of Blanchard, and I know about the killing of Blanchard. I was with Williams the night when the murder was committed; it was a pick handle the murder was committed with. We started from Williams' house. We went across Williams' pasture, near the blacksmith shop. We went down across the field to Mahon's fence, and waited there awhile till he, Blanchard, came up, when Williams jumped out from the fence and struck him three or four times. Williams then stepped back from the body. We stopped in the ditch, and stopped there one-half or three-quarters of an hour. The first fence we stopped by was a board fence. These are the boots—have worn them since June. Williams had on a pair of boots with brands in them; these look like the boots; the boots Williams had on he put in the well the next day, as he told me. Williams asked me three or four times to go with him and I refused him, and finally consented. He said he wanted to go and thrash Blanchard. I believe the cause was about property. At the time of starting, I did not know he in-

People *v.* Williams.

tended to kill Blanchard. The pick handle had been in the cellar since I lived at Williams'."

After this testimony the witness was asked, "Did you see old man Blanchard at Buckner's in presence of Putney and Marion Samples a few days before he was killed?"—to which the witness answered affirmatively. The next question, and on which the main error assigned is based, was: "Did you not then and there state that you intended to kill Blanchard?" This question was objected to: 1st, because it was on cross-examination; and 2d, that it was irrelevant. The objection was sustained. We presume that the last ground was the one on which the learned Judge below placed his ruling; for it is too clear for argument that if the question was admissible at all, the defendant had a right to elicit the answer on cross-examination as explanatory of the relations of the witness to the matter as to which he was testifying.

It has been observed that this witness occupied a very equivocal and suspicious position. He had already announced his own infamy, and that he was guilty of one of the darkest offenses in the catalogue of human crime. It is not unreasonable to suppose, from his occupying the witness' stand, that strong motives actuated him to prove the defendant to be guilty of this offense, and to palliate as much as possible his own guilt. The law to prevent immunity for crimes permits such men to be witnesses, but with the same solicitude for the protection of the citizen, watches with jealous scrutiny their testimony. It will not permit any citizen to be convicted solely by the testimony of the accomplice, but requires corroboration of his statements from independent sources. The utmost latitude of cross-examination justified by the law in any case should be extended to the testimony of such a witness. The Court should permit him to be thoroughly sifted. His connection with the parties, his conduct, his leanings, his prejudices, his recollection, his means of knowledge, his disposition to tell the truth, his motives to commit perjury, his whole conduct, in short, in relation to the facts he professes to reveal and the parties, should be suffered to be fully exposed to the jury. To do this is the general office of a cross-examination, and this is more especially important in respect to such a witness. Such an examination could do no possible harm if the

witness could stand the ordeal, and it might do a great deal of good if he could not.

It has been noticed that Blake conveyed, by his testimony in chief, the idea that he was a reluctant and unwilling abettor in this crime. It will also be noticed that he charges Williams with the actual execution of the murder; and that he exonerates himself from any further criminality than going with Williams to whip or chastise Blanchard. The theory of the defense was, that Blake himself did the murder; that there was a sufficient motive in Blake to do it; that Blake could as well have done it alone, or in conjunction with some other person than Williams, as in conspiracy with him. Anything, therefore, which contradicted Blake's statements, or had a legal tendency to show that they were false, was admissible evidence in rebuttal on the part of Williams. The evidence sought to be elicited was directly of this nature, and tended to this result. It tended to show, if believed, malice on the part of Blake; and a motive on his part to make the assault, and it tended to contradict and discredit his statement, that he went to the scene and assisted in the act of the murder, merely by the instigation and through the persuasion of Williams. Whatever in such a condition of proofs could be shown to detract from the credit of this witness —to bring his statements into suspicion or to show their falsity in any material particular—would therefore be admissible; and the force and effect of the whole, and of every portion of his narrative, would or might be diminished in the judgment of the jury by the falsehood of any part. It is argued by the Attorney General that this proof of personal hostility, or threats evidencing it, on the part of the witness toward the deceased, was wholly unimportant, for he had confessed in his testimony in chief his own guilty participation in the crime, and such testimony would only tend to prove it, and it tended to prove as well the commission of the murder by both Blake and Williams, as by Williams alone. But this answer does not meet the objection. One object of the testimony was to show that Blake's account of this matter was false; that whereas he had stated that Williams persuaded him to go with him to the place of the murder, and to assist in its perpetration, he had in fact a motive of personal malice, and had himself threatened and formed a pur-

pose to kill the deceased.   Whether this were conclusive proof of a contradiction, virtual or literal, it is needless to inquire, for the question here merely touches the admissibility of this proof, not the effect of it.   Nor is it material whether this proffered proof of contradiction related to the more material portions of the testimony of the witness; for the defendant had a right to disprove the whole and every part of the statement which connected him with the murder; and this proof of procurement of Blake to go, and assist in committing the deed, was, or might have been considered of great weight, as showing defendant guilty of a preconcerted and deliberate crime.

Leaving out of consideration, therefore, everything else, the offered testimony was admissible, as tending to show inferentially a contradiction in the witness' statement in this, that he represented that he had gone at the instance and by the mere persuasion of Williams, and this proof of hostility and threats to kill the deceased tended to show a motive personal to himself, and a purpose of his own volition to perpetrate the murder.   Besides, the proof of threats by Blake to kill, followed by an actual homicide, was *some* evidence that Blake himself did the deed, and therefore contradictory of his statement that Williams did it; or at least that the witness assisted actively in it—in which event, the jury would probably regard his testimony more unfavorably than if he was merely passive, and were present by the persuasion of Williams, not expecting a homicide, but only an assault, and not meaning to aid in a murder.

The second point, in reference to the omission to prove the killing to have been done in the county laid, we are inclined to think not well taken.   But it is not necessary to pass upon it, for the reason that the alleged defect of proof will not probably occur again.   It is easy to prove the venue, by direct evidence, and it is better to introduce direct proof, and not trust to presumptions or inferences.

In consideration of the number of appeals brought to this Court in criminal cases upon technical points, having for the most part no necessary connection with the merits, we feel warranted in making some suggestions, an attention to which we are persuaded will lead to a more speedy and satisfactory enforcement of criminal justice.   In capital cases, almost every case is appealed.   We do

not complain of this, even when the grounds of appeal do not present a plausible reason for the reversal of the judgment, since a natural sense of responsibility in the counsel to whose hands the life of a fellow being is confided may well influence him to exhaust every legal resource to save his client from the last penalty of the law. But still it is important that the laws should be enforced, so as to render as certain as possible the conviction of those guilty of their infraction. With every disposition on the part of the Judges to do this, the effort frequently fails, because something is done or omitted which contravenes some arbitrary or technical right of the prisoner. Courts have no power in criminal cases to affirm a judgment, merely because the Judges are persuaded that upon the merits of the case the judgment is right. If any error intervenes in the proceeding, it is presumed to be injurious to the prisoner, and generally he is entitled to a reversal of the judgment, for it is his constitutional privilege to stand upon his strict legal rights, and to be tried according to law. And yet it very often happens that the matter of exception taken by him serves no other purpose than to defeat justice. For example, a question proper in itself is asked a witness, and the Court refuses to allow the answer; if answered, the reply would possibly be worth little or nothing to the defense; yet for this error we would be bound to reverse a judgment which would have been the same whether the question were answered or not; for, though we might surmise, we could not *know* the effect of the denial of this legal right upon the jury, who are the sole judges of the facts. And many other illustrations might be given. As no man ought to be convicted unless, on a full exposure of the merits of the case, he is really guilty, it would seem that little or nothing is to be gained by interposing technical objections to keep a knowledge of the whole case on its legal merits from the jury. Questions as to the admissibility of evidence frequently arise, and in the hurry of a *nisi prius* trial the best Judge may err, especially when suddenly called to pass upon them without the aid of books or argument. These constitute the usual grounds of reversal. Whenever there is any doubt of the question, or rather, whenever the evidence proposed by the defense is not plainly inadmissible, it is better to let it go in, since, in nine cases out of ten, a single equiv-

ocal fact, of doubtful bearing upon the case, would have no effect upon the judgment of the jurors, who are usually disposed to pass and do pass upon the general merits.    Not unfrequently the offer to make the proof and the exclusion of it have about the same effect on the minds of the jury—though it should not—as if the proof were introduced.    If the course here suggested were pursued by Prosecuting Attorneys, we are convinced that the number of convictions would not be less than at present, while the number of appeals, or at least the number of those successfully prosecuted, would be greatly diminished.

We make these observations without reference to the merits of the case before us.    We have no right and no disposition to prejudice the defendant upon the facts—which are within the exclusive province of the jury, who will pass upon his case.

Judgment reversed and cause remanded.