[Crim. No. 2996. Second Appellate District, Division Two.—August 12, 1937.]

THE PEOPLE, Respondent, v. RALEIGH FREMONT, Appellant.

Charles W. Ostrom, Harold J. Goldman and Lyon, Fleming & Robbins for Appellant.

U. S. Webb, Attorney-General, and Bayard Rhone, Deputy Attorney-General, for Respondent.

WOOD, J.—Defendant was charged with the crime of rape in that he had ''an act of sexual intercourse with and upon one Bonnie Jean Wrankle who was then and there a female person under the age of eighteen years, to-wit, of the age of thirteen years''. It was further charged that at the time of the commission of the offense the defendant was armed with a revolver. In count II of the information the defendant was charged with the crime of assault with a deadly weapon committed upon Bonnie Jean Wrankle. Upon a trial by jury a verdict was rendered finding defendant guilty of the crime of rape as charged in count I but finding that the defendant was not armed at the time of the commission of the offense. On count II the jury found defendant guilty of simple assault. From a judgment sentencing defendant to a term in the penitentiary and from the order of the court denying defendant's motion for a new trial this appeal is prosecuted.

One of the contentions of the defendant is that the evidence is insufficient to justify the conviction. It is to be noted that the district attorney charged the defendant under

that part of the statute which makes it a felony to have intercourse with a female under the age of eighteen years. The evidence of the prosecutrix, if it is to be believed, shows that the acts charged come within the provisions of the statute making it a felony to have sexual intercourse with a female whose resistance is overcome by force or violence. At the outset we might use the language of Chief Justice Waste in *People* v. *Pantages*, 212 Cal. 237, 278 [297 Pac. 890, 908], where he said that "the testimony of the prosecutrix is so improbable as to challenge one's credulity". The language used by Chief Justice Murray in *People* v. *Benson*, 6 Cal. 221 [65 Am. Dec. 506], is applicable to the present case: "The case before us is supported alone by the evidence of the prosecutrix, a young ignorant girl, thirteen years of age, and is so improbable of itself as to warrant us in the belief that the verdict was more the result of prejudice or popular excitement, than the calm and dispassionate conclusion upon the facts by twelve men sworn to discharge their duty faithfully."

We will first set forth the statement of the prosecutrix as given upon the witness stand. She testified that she is thirteen years of age and weighs 115 pounds. Defendant was a family friend. In the evening of December 14, 1936, defendant came to the home of prosecutrix and remained at the house about one hour and a half and then left with Betty Wrankle, the sister of the prosecutrix. They returned in about a half hour and remained another half hour. The defendant, the two sisters and their mother had dinner together and defendant suggested to the sisters that they see a moving picture. Betty did not care to go but Bonnie, the prosecutrix, with the approval of her mother, decided to go and Bonnie and defendant left in defendant's car. When they were on the way defendant asked if Bonnie would prefer to go to Mrs. Secko's house at Reseda. Upon Bonnie's indicating a preference to go to Mrs. Secko's house they went to Reseda. Defendant remained in the car for about twenty-five minutes, when Mrs. Secko and the prosecutrix came out. All of them drove to a cafe where they stayed about an hour. They then took Mrs. Secko home and started to return to Bonnie's home. (Up to this point there is no substantial difference between the testimony of the prosecutrix and that of the defendant.) The prosecutrix testified that

the defendant turned to the right and into the mountains, telling her that it was a short cut. It became foggy and the prosecutrix insisted that they should not go farther in the fog. Thereupon the defendant turned the car around and stopped it. Defendant then put his hand under her dress. To use her language as shown by the record: "I started to scream and he just held my hands back and I screamed and screamed . . . he started to raise up, he sort of scooted under the wheel next to me, and then he started to raise up over me and as he raised I scooted under him, under the wheel and then I got out on the left side and he tried to follow me, to pull my hand and I just jerked away and then I got away and I went out in front of the car and I ran down the hill, and as I was running down the hill, well, I ran in some brush and I tried to fight my way through the brush and it got so bad that I could not hardly go through it, so I just kept fighting and all of a sudden I looked back and he was right behind me and he just grabbed my ankle and tripped me and I got right up again and so he held my hands and then he lifted my dress and I kept fighting, I said 'Stop', and I screamed and everything and he let me go, he sort of pushed me and I sort of fell back and as I fell back, well, he jerked my underclothes off." Quoting further from the record: "By Mr. Emerson: What kind of underclothes were you wearing that night, separate pants and shirt? A. Yes. Q. And did he take off your entire underclothes? A. No. Q. What part did he take off? A. Just my pants. Q. All right. After he pulled the pants off then what happened? A. Then he started to raise my dress and I screamed and he put his hand upon my throat, over my mouth, and I tried to pull it away and then he just took, as I tried to pull away, he just grabbed my throat and started jerking me back and forth and I screamed, I could not hardly see and then after that well, he kept pulling me and everything, and he finally raised up my dress and I kept kicking and everything and then he kept slapping my face and I said, 'Oh, stop.' 'I won't hurt you.' I said, 'I have to go to school tomorrow, there are other girls, I have to get an education.' So he just slapped me and said, 'Shut up,' and so then, well, after that, well, he pulled up my dress again and kept a slapping me and everything, and then he let go and he took hold of both my hands again and he unbuttoned his trousers and he took his thing out. Q. Do you know what a man's private parts are,

Bonnie? A. Yes. Q. And what did the defendant do then? A. Well, he took out his private parts. Q. All right, what did he do after that? A. Well, then after he had taken them out, well, he lifted up my dress and held my hands and I kept a kicking him and tried to hit him and everything and he put his private parts in mine. Then I pushed him right away. Well, after that, well, he tried it again and— Q. Now, the first time he put his private parts into your private parts about how long did he keep them in? A. Half a second. Q. Then what happened? A. Then he started up again. Q. And the second time how long did he leave them in? A. Just about a second. Q. And then what happened after that. A. Then he said, 'All right, let's go.' So I pushed him, I—after I pushed down my dress, and he took my pants some place, and we went out of the bushes, and he kept running from me, I thought he was going to leave me there, so I ran up the mountains, and I heard him, and he said, 'I will kill you when I get up there,' so as I went up the mountains I got over a ways from him, I just went up from the mountains, I climbed up the mountains, and I got across the street away from him. Then he said, 'Bonnie,' —I did not answer him. He said, 'Bonnie, where are you?' I did not answer him. He said, 'Bonnie, Bonnie,' and I just kept running. And I was so dizzy I could not hardly tell where I was going, and instead of running away from him I ran over the hills toward him, and then after I was over a little ways, well, I stood there for a minute in sort of a daze, I thought I was far away from him, but all of a sudden I heard two little shots, and so I wondered what it was, I could not understand what it was. So I started up to see what it was, and then I seen a figure of a man across the street, so I ran back and he said, 'Stop, or I will shoot.' And I just ran up, I did not answer him or any thing. I hid behind a brush at first, and he said, 'I will kill you, I will kill you, I tell you I will kill you,' and he shot again, and as he was going across the street then he shot again, I could see a sort of fire, I knew it was a gun then.'' With reference to the actual act of intercourse the prosecutrix testified: ''Q. And what position were you in when that happened, Bonnie? A. Well, there was a whole lot of shrubbery back of me, and I sort of—he sort of pushed me against this, and I was sort of slanting. Q. You were not lying down on the ground? A.

No, sir, I was not. Q. Were your feet on the ground? A. Yes, they were. Q. You were back up against some bushes? A. Yes, sir. Q. In a slanting position? A. Yes, sir.'' With reference to her resistance the prosecutrix testified: ''Q. That struggle lasted about a half hour, didn't it; I mean down there were these alleged acts, you know what I mean by that, I don't want to say it any other way? A. Yes. Q. About a half hour? A. Yes. Q. And you were struggling all the time? A. Yes. Q. And he was choking you, is that right? A. Yes. Q. Practically all the time? A. Yes.''

With reference to the occurrences after the alleged acts of intercourse we will set forth the testimony of the prosecutrix as furnished us in the brief from the attorney-general's office, which, as usual, states the issues in a manner fair to both sides and helpful to the court: ''The prosecutrix then testified at great length with reference to the occurrences afterward. It seems that the appellant came up to the prosecutrix who was lying in the brush, stuck the gun in her ribs and told her to get up. She picked up a rock and hit him with it over the head. He dragged her to the car and shoved her in. They then drove away but they were apparently lost in the hills and tried to turn the car around. In doing so the appellant backed into a driveway. At that time the prosecutrix jumped out of the car, jumped over a low wall, went up to a house and called for help. It seems she could not raise anyone by merely knocking and shouting and finally broke several windows. In rather a weird tale the prosecutrix told about going in the house, turning the lights on and then off, and going out of the house. In some way or other she emerged on the roof of the house and as flashlights were flashing near her she backed up into a chimney which she subsequently dropped into.'' Counsel was correct in referring to her statement as a ''weird tale''. The prosecutrix further testified that on the ride with the defendant after the alleged intercourse, they talked naturally, did not refer to the intercourse but talked ''mostly about where he was hurt'', when she hit him with a rock. In answer to the question, ''Now Bonnie, after you started, after you hit him with a rock, you told him you were sorry?'' She replied, ''Yes.'' She further testified that she had had previous sexual experience before the night in question. With

reference to the money in possession of the defendant, hereafter referred to, the prosecutrix testified that she had the money in her possession during the evening but she gave it back to him.

The testimony of the defendant is far more reasonable than that of the prosecutrix. He testified that the mother of the prosecutrix had spoken to him about a loan of $200; that Bonnie mentioned to him that it was nice of him to lend her mother the money and asked him if he would let her see it. Having the money in her possession, she told him that she would return it to him if he would let her drive the car until they got near the city. Thereupon the defendant permitted the prosecutrix to drive but she drove up Laurel Canyon road. He told her that she was driving too fast. The prosecutrix took the wrong road and was so informed by the defendant. An argument on this question ensued and the defendant turned off the ignition and told her he was going to drive the car. He got out of the car and walked around to get into the driver's seat and found that the prosecutrix had gone. He called for some time to her, finally found her and tried to lead her back to the car but she jerked away. He returned to the car and waited there for a few minutes during which time it was raining hard. After some little waiting he drove up the Mullholland Drive a short distance, turned the car around and came slowly back, coasting. He turned on the ignition switch and the car back-fired several times. He drove the car a little farther, turned off the switch and the car again back-fired. He got out of the car and called to the prosecutrix and she replied that she was coming. Just before reaching the car she hit him on the back of the head with a rock and knocked him to his knees. After some discussion they entered the car and drove on. During the ride she wiped his head with a cloth and he told her that he was badly injured and that she had better return the money to him at once because if he should die she would get caught with the money and would be accused of robbing him. To this she replied she would not return the money until she got home. Soon they came to a crossroad and defendant did not know which road to take. He got out to read a sign and upon returning to the car found that Bonnie had gone.

Corroboration for the statement of the prosecutrix is lacking but the statement of the defendant is supported by the testimony of several witnesses. The prosecutrix testified that the occurrences took place at 12:30 o'clock in the morning. The mother of the prosecutrix testified that the defendant telephoned to her at 12:45 o'clock in the morning to notify her that Bonnie was missing. A night watchman and a gardener testified that about 4 o'clock in the morning of the same day defendant was searching for his money in the neighborhood where the occurrences related herein took place and that they found $180 in the shrubbery. On the other hand, there is a lack of corroborating evidence in support of the prosecutrix's testimony on points where it should be expected. She was examined soon after the alleged attack and the physician testified that she found no marks or bruises about the neck of the prosecutrix. Such marks would naturally be found after a severe and prolonged choking. Certain bruises were found about the legs but these can be accounted for by her experience in the chimney. No definite conclusion can be drawn from her testimony concerning the examination of the vagina. It is noteworthy that the jury by its verdict showed lack of credence in the statement of the prosecutrix that the defendant stuck a gun in her ribs.

Counsel for defendant confidently and convincingly contend that the statements of the prosecutrix concerning the actual acts of intercourse cannot be true, referring especially to the fact that she remained on her feet. They further point out that the evidence shows that some of the material statements of the prosecutrix were false. She testified that she could not drive an automobile but her father and mother both testified that Bonnie could and had driven a car. Three days after the occurrences in question an action was commenced in court by the mother as guardian *ad litem* to recover from the defendant the sum of $200,000. The prosecutrix testified that she had no knowledge of the filing of this action but her brother, her sister, and her mother's attorney all testified concerning facts from which it appears that the statement of the prosecutrix in this regard must have been false. The conduct of the prosecutrix in court was not such as to inspire confidence in her statements. The following is taken from the record: "The Court: Pardon me, Mr. Ostrom, will you and Mr. Emerson approach the bench? (The fol-

lowing proceedings took place at the bench out of the hearing of the jury.) The Court: I have been watching Bonnie Jean for a long time over there. Mr. Ostrom: I could not see her. The Court: I have been watching Bonnie, and as he was telling the story she was smiling and rolling her eyes and things of that kind that I do not like. Mr. Ostrom: Neither do I. Mr. Emerson: Do you think that she should be out of the court room, your Honor? The Court: I was watching Bonnie Jean, but the jury was not looking at her, they were all looking at the defendant on the witness stand.'' Shortly afterwards the prosecutrix was quietly called from the courtroom.

As stated in *People* v. *Flores,* 15 Cal. App. (2d) 385 [59 Pac. (2d) 517], since the evidence appears to be incredible the rulings and instructions of the court become of grave consequence. The court instructed the jury on the subject of the flight of the defendant in the language of section 1127c of the Penal Code. No evidence was presented to justify the giving of an instruction on the subject of the flight of the defendant. No instruction should be given to the jury unless adapted to the evidence and circumstances of the case. (*People* v. *Maughs,* 149 Cal. 253 [86 Pac. 187].)

 The trial court erred in sustaining the objection of the district attorney to the introduction in evidence of three photographs of the territory where the occurrences in question took place. (*People* v. *Loper,* 159 Cal. 6 [112 Pac. 720, Ann. Cas. 1912B, 1193].) The foundation was sufficiently laid for the introduction of these photographs.

The judgment and order are reversed. It is further ordered that the defendant be discharged from custody.

Crail, P. J., and McComb, J., concurred.