[Crim. No. 3601. Second Dist., Div. Three. Dec. 19, 1942.]

THE PEOPLE, Respondent, v. HAROLD HUME, Appellant.

Haas & Home and Paul E. Tapley for Appellant.

Earl Warren, Attorney General, and R. S. McLaughlin, Deputy Attorney General, for Respondent.

SHINN, J.—Defendant was accused by information of the offense of forcible rape, was convicted by the court sitting without a jury, and appeals.

He challenges the sufficiency of the evidence to establish his guilt. While the argument made in support of this contention is impressive, we have concluded that the evidence was not legally insufficient to establish guilt, though we must say that the scale is so evenly balanced that there is nothing to spare in the prosecution's case. We have concluded, however, that the judgment must be reversed because the cross-examination of the prosecutrix was restricted in such manner as to impair seriously the right of the defendant to a fair trial. The point necessitates a statement of the evidence upon which the conviction rests.

Prosecutrix is a colored woman, 20 years old; at the time of the alleged offense she was and previously had been employed in the family of a policeman in Hollywood for some four years. She and defendant, a white man aged 32 years, entered a public motor bus about 11 o'clock one Sunday night at Santa Monica and Western Avenues in Hollywood; eight or ten minutes later they alighted at the corner of Bronson and Franklin Avenues some three blocks from the residence where prosecutrix was employed and lived. According to her testimony, defendant followed her for two or three blocks, when he spoke to her and asked her if she had been working,

to which she answered no; he asked her if she was angry with anyone and she said no; defendant grabbed her between the hips and shoulders and she told him to take his hands off of her; that she started fighting with all of her might when defendant was pulling her into a driveway and was trying to pull away from him; that he pulled her into a dark driveway beyond some rocks that were one or two feet high; that she fell to the ground and that defendant pulled up her dress and raped her. She was wearing an undershirt, pants with an elastic band at the top, a slip, a dress and a coat, a "reversible wrap"; that defendant pulled at her pants and "got the hip part down and a leg off by tearing it." This garment was placed in evidence and showed "a tear in the crotch and on one of the legs." She testified that defendant struck her a good many times with his fist, mostly upon the temple; that she struck defendant in the face and kicked him; that she was fighting with him and trying to get up and while he was lying upon her she took a knife from her pocket, tried to open it but did not succeed and struck defendant in the back with it; that before she fell defendant struck her in the temple; that the blow did not knock her down but that she was dazed; that defendant raised one of her legs and she fell; that she was not able to fight much while she was on the ground but that she "tore up the ground there." She testified that about one hour elapsed between the commencement of the attack and her running away from defendant, as hereinafter stated. The place where the act took place was within about 60 feet of the place where prosecutrix worked and of three other houses. Prosecutrix did not scream or call for help. She testified that she made muffled noises; that defendant had hold of her coat collar and was pulling it and choking her and that eventually she was too weak to resist any further; that most of the fighting was done before she fell to the ground. After the act had been accomplished defendant arose and became nauseated. Prosecutrix also arose from the ground, reached into defendant's pocket, took his wallet and ran away with it. Defendant chased her to the house, calling to her on the way; at the house they had a scuffle, defendant endeavoring to regain his wallet, which prosecutrix threw into the yard. They knocked over some milk bottles and her employer, the policeman, was aroused by the commotion, came out of the house, defendant ran down the driveway, the

policeman went after him, brought him back and detained him at the house until policemen whom he summoned arrived. Prosecutrix went to her room, did not see the defendant during this interval, but did go into the yard and retrieve the wallet. Later that evening she went to the Hollywood Receiving Hospital, where she received some attention. She was examined by a physician but did not call his attention to any injuries and there were no visible evidences of injury either upon her person or that of defendant. In the meantime she took the officers to the place where the alleged struggle had occurred and showed them the ground, which they examined.

The employer testified to having detained defendant until the officers came; that defendant was somewhat intoxicated, said that prosecutrix wanted to "neck" a little and that she had taken his purse.

A police officer testified that he was one of the arresting officers; that he did not observe any marks or scratches on defendant's face; that defendant took him to a place where he said the trouble occurred, which was "a kind of cove and white soil, possibly sand, or mixed with white sand," and he (the officer) made an examination of the place, but did not find any evidence of a struggle; that the prosecutrix was not present when he examined that place but she was there afterward and pointed out the scene of the struggle; that defendant was intoxicated, he was "plenty drunk" but not "good and drunk."

Another arresting officer testified that defendant was semi-intoxicated; that the prosecutrix took him (the officer) to the place where she said the attack took place; that he examined the place and found footprints on the ground which extended within a radius of one yard but he did not find any evidence of a struggle at all.

Defendant gave to the officers essentially the same account of the occurrence that he gave upon the stand. He testified that he first saw the prosecutrix when he was standing on the corner at Santa Monica and Western Avenues; that he flirted with her, entered the bus when she did, sat behind her on the bus, and started a conversation with her; that he alighted from the bus with her and they walked arm in arm about three blocks; that he then kissed her and she kissed him; that she helped him pull her dress up and he started to have intercourse with her while standing; that

this was inconvenient for both of them and that she said she knew a better place and took him to the cove where they lay down, and with her consent he took one leg of her pants off, and with her consent had intercourse with her for about 20 minutes; that when they were about through she said he would have to pay her and when he said he would not pay, she got out a knife and he took it from her and threw it away; that he did not choke or strike her at any time and she did not make any outcry; that when he was standing, after the intercourse, he was nauseated and she was standing by his side sympathizing with him and had one arm around him; that she reached into his pocket "awful quick"; that when she started to run away he missed his wallet; that he chased her, caught her at the doorstep and tried to get his wallet; that when they knocked some milk bottles over the employer called out and defendant went away at a brisk walk but was stopped by the employer and taken back to the house; that he told the employer and the other officers what had happened; that he (defendant) had had a few drinks; that the only time he "had a scrap with her" was at the back door when he was trying to get his purse.

A witness, who saw the defendant when he was released on bail the night of the trouble, testified that defendant's face was not bruised, swollen or scratched at that time.

█ It appears from the record to have been the contention of defendant's counsel that prosecutrix had applied for and been refused a criminal complaint by a certain deputy district attorney. She was asked upon cross-examination, in effect, if she had not given an account of the facts of the occurrence to this deputy district attorney which differed from the one she had related upon the stand. Defendant's counsel in that connection announced his purpose to be to prove contradictory statements by the prosecutrix. An objection by the district attorney on the ground that the testimony would be immaterial and not proper impeachment was sustained. This, we think, was error of the most grievous sort. The trial court was confronted with the grave and difficult duty of judging of the credibility of the prosecuting witness. The truthfulness of her statements was disputed by the sworn testimony of the defendant and by much circumstantial evidence. No effort should have been spared in subjecting her testimony to all of the tests which are sanctioned by law and the universal practice of our courts. █ The

right of cross-examination is implicit in the constitutional right of the accused to be confronted by the witnesses against him. As said in *People* v. *Flores,* (1936) 15 Cal.App.2d 385 [59 P.2d 517], at 401: "A full cross-examination is not a matter of privilege; it is a matter of 'absolute right'." Concerning this right, Justice Houser said in *People* v. *Ferdinand,* (1924) 194 Cal. 555, at 562 [229 P. 341]: "It is a most salutary rule which permits a wide latitude in cross-examination and one which is justly entitled to and which receives universal recognition. Its use and its purpose are so well known that to dilate thereon would add nothing to the superabundance of expressions relating thereto which are to be found in adjudications by the courts and in opinions by renowned text writers as well."

It can be asserted with confidence that in the entire field of cross-examination there will be found no more compelling occasion for the extension of the right to its broadest reasonable limits than is found in cases where the fate of those accused of sex crimes rests upon the uncorroborated testimony of their accusers. In cases of this nature it has been said that the accused is at such a disadvantage that "he should be given the full measure of every legal right in an endeavor to maintain his innocence." (*People* v. *Baldwin,* (1897) 117 Cal. 244, 249 [49 P. 186].)

The present case is one in which the trial judge should have welcomed every opportunity to hear evidence which might have been of assistance to him in judging of the weight which he should give to the testimony of the prosecuting witness. In the early case of *People* v. *Williams,* (1861) 18 Cal. 187, at 191, in declaring it to be prejudicial error to restrict the cross-examination of an accomplice, the court said: "His connection with the parties, his conduct, his leanings, his prejudices, his recollection, his means of knowledge, his disposition to tell the truth, his motives to commit perjury, his whole conduct, in short, in relation to the facts he professes to reveal and the parties, should be suffered to be fully exposed to the jury. To do this is the general office of a cross-examination, and this is more especially important in respect to such a witness. Such an examination could do no possible harm if the witness could stand the ordeal, and it might do a great deal of good if he could not." Surely this statement has equal force when applied to the testimony of the prose-

cutrix in the instant case. It would seem to admit of no doubt that a restriction upon the right of cross-examination would seriously prejudice the rights of an accused in a case of this sort. But the importance to defendant's case of a full cross-examination will be better appreciated from a consideration of some of the strange aspects of the tale related by the prosecutrix.

She testified that the encounter which culminated in her being sexually known by the defendant consumed an hour. How much of this time was taken up with a preliminary struggle cannot be ascertained or even approximated from her testimony. All of this time she was within about 60 feet of her home and other occupied residences. She made no outcry, although undoubtedly help was close at hand. Defendant was not armed, he made no threats, he committed no acts of violence upon her person so as to leave any visible evidence of injury; her clothes, except for her pants, were not torn; for a period of an hour she struggled with defendant, tearing up the ground, and yet there were to be found in the sand no more than footprints and no evidence of a struggle. She stated that she was dazed by a blow struck by defendant before she fell to the ground, but this alleged blow did not cause her to fall and did not cause any swelling or leave other visible mark at the point where it was alleged to have been struck. A careful reading of the testimony fails to disclose anything suggesting that prosecutrix was in fear of bodily injury. Her only explanation of her failure to make outcry was that defendant was holding her collar tight, but from the many other acts of defendant, which were related in detail, it appears that it would have been impossible for him to have prevented an outcry by prosecutrix in any such fashion. She had presence of mind enough, according to her story, to take a knife from her pocket and strike the defendant with it, and she had presence of mind enough to abstract the defendant's wallet from his pocket while he was suffering from nausea. Her explanation of this action was that she wished something by which to identify the defendant. Strangely enough, the identifying article happened to be defendant's wallet and she ran away with his money as the alleged "victim" did in *People* v. *Fremont,* (1937) 22 Cal.App.2d 292 [70 P.2d 1005]. The testimony of defendant that he took the knife away from the prosecutrix and threw it away during an argument following the act of intercourse

was not denied. We note also that it does not appear in the evidence whether prosecutrix made complaint to her employer before the other police officers arrived. Somewhat challenging to the imagination also is her testimony that although her pants were pulled down from her hips and removed from one of her legs, she did not pull them up but ran home with them in that condition. In view of the predicament in which she found herself after she had reached home and her employer had been aroused and called the police, she would have been obliged to accuse defendant as she did in order to furnish some justification for her own conduct in running away with his money. It can scarcely be doubted that the story of the defendant, sordid as it was, had support in every particular in which the circumstances tended to shed light upon what had occurred. Had it been shown that the prosecutrix had made statements to the deputy district attorney, to whom admittedly she related her story, that varied in any material respect from the story she told upon the stand, that impeachment, added to the impeachment furnished by the admitted facts of the case, would surely have been sufficient to resolve any doubts as to defendant's guilt in his favor.

The questioning of the witness on cross-examination which was foreclosed by the court's ruling was manifestly of a preliminary nature, but the ruling of the court was as broad as the subject to which the questions related and we think might well have been considered by defendant's counsel as foreclosing any further inquiry along the same line. As said in *Theatrical Enterprises, Inc.* v. *Ferron*, (1932) 119 Cal. App. 671, at 677 [7 P.2d 351], ''Orderly procedure requires that counsel submit to the rulings of the court, and it cannot be commended as good practice that an attorney battle his way into durance, to the end that error be demonstrated.'' We cannot know, of course, what further inquiry would have disclosed, but we freely assume that counsel were acting in good faith and expected, if permitted to do so, to show statements contradictory of those given at the trial. If he had been allowed to proceed and had succeeded, such contradictory statements might have influenced the decision of the entire case. Nothing which occurred at the trial would have been more helpful to the court in arriving at the truth than to know whether the prosecutrix had told the identical story

each time she had related it or whether she had varied it or added to it after her first narration, and nothing could have been more vital to defendant's case than to be able to show that she had made conflicting statements.

It seems to us that defendant's counsel should have had the active cooperation of the court in any good faith endeavors to test the credibility of the prosecuting witness. The field into which the cross-examination was attempted to be directed was a proper one. Of a similar situation, where an objection had been sustained to questions respecting alleged contradictory statements on the ground that no foundation had been laid, the court said in *People* v. *Jones,* (1911) 160 Cal. 358, at 365 [117 P. 176]: "Frequently, they are designed to test the recollection of the witness, and, frequently, as in the instance before us, the question is proper, though ultimately and according to the answer which may be made it will or will not be followed by a strictly impeaching question. Thus, it was proper to ask the witness if he had so testified. His answer might have been that he did not, when an impeaching question would properly follow. His answer might have been that he did so testify with explanation of the variance between his answers, in which case no impeaching question would be necessary, and it is an unwarranted curtailment of legitimate cross-examination to exclude such questions, as was here done, upon the ground that they are necessarily impeaching questions and the proper foundation for them has not been laid. (*People* v. *Hart,* 153 Cal. 261 [94 P. 1042].)"

There is another matter disclosed by the record which we cannot allow to pass unnoticed. Defendant's motion for new trial and his application for probation came on for hearing at the same time. Both were denied. In connection with the application for probation the following took place:

"Mr. Tapley: Well, I have read the report this morning. The only thing I would like to say is that I would like to ask your Honor to follow the report and extend as much leniency——

"The Court: I am going to say right here that I am not going to follow this report because this particular probation officer, I have said it before and I will say it again, I have lost entire confidence in him in this type of case. He spends 90 per cent of his time in his reports trying to show that the Court was wrong or that the jury was wrong.

"MR. TAPLEY: That places the defendant in a bad position.

"THE COURT: It does. It places the probation officer in a bad position too. This is not the first time. I have had him on other occasions where he spent most of his report, particularly on charges of this kind, of statutory rape, in excusing and defending the defendant and in trying to make out that the Court or the jury made a mistake, or in some instances that the man made a mistake in pleading guilty. I don't know what the complex is there but that is my observation. . . . He hasn't had the effrontery to come out and say he doesn't believe the defendant is not guilty [sic] ; but inferentially he does."

The foregoing excerpts from the record portray a condition existing in one of the criminal departments of the court in Los Angeles County which calls for the immediate attention of those who are in position to correct it. The inference is plain that a defendant convicted of a sex crime by the judge presiding in said department would be better off if the deputy probation officer whose recommendations arouse the ire of the judge should recommend against probation instead of in favor of it. It is unthinkable that a convicted man should be sent to the penitentiary because of the ill will of a judge toward a probation officer, and we might add that if probation is ever proper in a case of forcible rape, and the law permits of probation in such cases, it would be somewhat difficult, we think, to find a milder case of forcible rape than the one before us, if, indeed, it was rape at all. And we might add that defendant was shown to be an unmarried man, of good repute and employed as an artisan in one position for 10 years.

The judgment is reversed.

Schauer, P. J., concurred.

WOOD (Parker), J.—I dissent. The case was tried without a jury. The trial judge had the benefit of personal observation of the witnesses. He stated that he believed the prosecutrix. The rule is that if the circumstances reasonably justify the findings of the trier of facts, the opinion of the reviewing court that those circumstances also might be reconciled reasonably with the innocence of the defendant will

not warrant interference with the determination of the trier of the facts. (*People* v. *Newland*, (1940) 15 Cal.2d 678, 681 [104 P.2d 778].)

Appellant's only contention on appeal is that the testimony of the prosecutrix is disproved by the physical facts and is so inherently improbable that it is unworthy of belief.

In support of his contention, the appellant refers to testimony as follows: (1) that there was no evidence of a struggle at the place of the trouble, on the ground or otherwise; (2) that there were no marks on her face to indicate that he had struck her on the face; (3) that there were no marks on his face to indicate that she had struck him on the face; and (4) that there were no marks on or about her neck to indicate that he had choked her. Defendant's argument is: (1) that the ground, at the place where the prosecutrix said there was a struggle, was "possibly sand or mixed with white sand" and therefore was impressionable, and if her testimony, that there was a struggle while they were on the ground, were true, the ground would have shown evidence other than ordinary footprints; (2) that if defendant struck her on the face, as she said he did, such striking necessarily would have left some marks, bruises or scratches on her face; (3) that if she struck him on the face, as she said she did, such striking would have left some evidence thereof on his face; and (4) that if he choked her, as she said he did, there would have been evidence of it on her neck.

Although it was not unreasonable to believe that there would be marks on the ground as a result of the kicking and struggling related by the prosecutrix, it should not be concluded that such marks would result necessarily. The degree of hardness of the surface of ground that is "possibly sand or mixed with white sand" would depend upon the compactness of the sand, if it was sand, and on the kind, proportions, and compactness of various elements constituting the mixture, if it was mixed with sand. Concerning the struggle, she testified that after she was on the ground she was unable to fight any more, or do "any more kicking, hardly," but she could move about, "tore up the ground there," and "was fighting, trying to get up." The testimony concerning the kind of ground was not so explicit that it must be concluded that evidence of such a struggle would appear certainly on the ground. There was evidence

that footprints covering a "radius of one yard" were found at the place where the intercourse occurred. In other words, there were footprints which covered a space 6 feet in diameter. The defendant was standing while he was vomiting after the intercourse and the prosecutrix was standing by him. If any marks evidencing a struggle had been on the ground they might have been obliterated by the footprints.

The evidence relative to the striking and choking, likewise, was not so specific as to the manner in which those acts were committed that it must be concluded that marks, bruises or scratches would appear certainly on the face or neck of the prosecutrix or on the face of the defendant. Whether there would be noticeable results of striking on the face with a fist, or of choking, would depend on numerous conditions, such as the part of the fist which came in contact with the face, the force used, and the complexion of the person struck or choked. Her testimony, concerning those acts, was that he hit her a good many times with his fist, principally on the temple, but it did not cause her to fall; that she struck him on the face many times and kicked him; and that the choking was done by pulling her coat collar together at the neck. It cannot be declared accurately that striking and choking a person, in the manner described in the testimony herein, could not be done without producing obvious physical results thereof. The part of the fist which came in contact with the temple of the prosecutrix is not indicated by the testimony, but it is reasonably probable that a person could be hit on the temple several times with a fist in such a manner that no bruise or scratch would result therefrom. Also it is reasonably probable that a coat collar might be so constructed of smooth, soft materials that it could be pulled together in such a manner around the neck of a person that the person would be choked temporarily and no mark on the body result therefrom.

The testimony herein was different materially from the testimony in the case of *People* v. *Fremont*, (1937) 22 Cal. App.2d 292 [70 P.2d 1005], cited by appellant as an authority holding that since no marks were visible, indicating that a person had been choked, that the testimony of the person that she was choked was inherently improbable. In that case the testimony was (p. 295) that the defendant "grabbed my throat and started jerking me back and forth and . . . I

could not hardly see." The court said (p. 299): ". . . the physician . . . found no marks or bruises about the neck of the prosecutrix. Such marks would naturally be found after a severe and prolonged choking." The evidence as to choking in the present case cannot be characterized as severe.

The evidence of the prosecutrix was sufficient to show the resistance required by law. "In this state it is not required that the prosecutrix resist as long as strength endures or consciousness continues. The resistance required in each case depends upon the circumstances of that case, such as the relative strength of the parties, the uselessness of resistance, the degree of force manifested and other factors. The resistance of the prosecutrix need only be such as to make nonconsent and actual resistance reasonably manifest." (*People* v. *Burnette,* (1940) 39 Cal.App.2d 215, 224 [102 P.2d 790].)

It was not necessary that her testimony be corroborated. (*People* v. *Norrington,* (1921) 55 Cal.App. 103, 108 [202 P. 932].) Nor was it a requirement that the prosecutrix make an outcry. (*People* v. *Norrington, supra,* at page 111.) Appellant argues that the failure to make an outcry, where an opportunity exists, raises a strong presumption of consent; that she did not scream although she was within 60 feet of her home; and that she had an opportunity to make an outcry, in that her mouth was not muffled and her coat collar was not pulled together all of the time. A statement made in *People* v. *Norrington, supra,* at page 111, is applicable here: "From all of the facts . . . the jury [judge] may not unreasonably have believed that, throughout the experiences through which she passed . . . the prosecutrix acted upon the honest belief that she best could extricate herself from her predicament by remaining calm and collected, relying upon her wits rather than by making an outcry and thus peradventure run the risk of being choked into insensibility."

The facts in the case of *People* v. *Kinne,* (1938) 25 Cal. App.2d 112 [76 P.2d 714] were similar in several respects to the facts in the present case. In that case the prosecutrix and the defendant boarded an electric car at the same place. When the prosecutrix left the car, the defendant also left the car and followed her about one-half of a mile, grabbed her around the neck, told her not to scream, pushed her into a vacant lot, and raped her. She testified that she did not

resist because she was afraid to resist. The only ground of appeal was that there was no resistance. The court said, at page 114, "Obviously the same question raised herein on appeal was presented to the trial judge . . . and, from a review of the evidence, it cannot be said that the trial judge erred as a matter of law in adjudging the defendant guilty. . . . What would have happened to the prosecutrix at the hands of the defendant, if she had pursued a different course, is problematical."

In regard to the asserted refusal of the trial court, referred to in the majority opinion, to permit the defendant to show alleged inconsistent statements made by the prosecutrix, the record on appeal shows the complete proceedings in that respect were as follows: "Q. You remember seeing a Deputy District Attorney, in Harry Borde's office and telling him your story? A. Yes. Q. You talked to two of them? A. No, sir. Q. Are you talking about the Deputy District Attorney that told you he could not issue a complaint—— Mr. Galliano: Objected to as immaterial, not impeaching. Mr. Tapley: I have something which may be in the nature of inconsistent statements—— The Court: Overruled. Q. By Mr. Tapley: You did not tell Mr. Borde the same story that you are telling here? Mr. Galliano: Objected to as immaterial, not proper impeachment. The Court: Sustained. Mr. Tapley: No further questions. Mr. Galliano: No redirect."

It will be noted that the attorney for the defendant stated, when the first objection above quoted was made, that, "I have something which may be in the nature of inconsistent statements," and that the court *overruled* the objection. It will be noted further that defendant's attorney thereupon asked an objectionable question which was as follows: "You did not tell Mr. Borde the same story that you are telling here?" An answer to that question would have been a conclusion. The deputy district attorney objected to the question "as immaterial and not proper impeachment." The court then said, "sustained." The grounds stated as the basis for the objection were, perhaps, insufficient. The ruling, sustaining the objection, was correct, however, since the answer to the question would have been an opinion of the witness as to the comparison of the two conversations. In the case of *Davey* v. *Sou. Pac. Co.,* (1897) 116 Cal. 325 [48 P. 117], at page

330, it was stated: "An objection to evidence is but a reason offered for its exclusion. The objection may be untenable or insufficient, yet, if sustained, and there appears any other reason for which the evidence should have been excluded, the ruling must stand. And even where no objection is made, but the court excludes evidence of its own motion, the ruling will be sustained, if the evidence was for any reason inadmissible.

" 'If the court decides correctly in rejecting the testimony, it is not important whether the best objection was made, or whether any objection was made.' [Citing cases.]

"Nor does the fact that a party has made an improper or insufficient objection in the court below preclude or estop him in this court from justifying a ruling in his favor upon any other ground."

It was stated in *People* v. *Bidleman,* (1894) 104 Cal. 608 [38 P. 502], at page 612: "Upon cross-examination of a witness for the prosecution counsel for defendant asked him what conclusion he came to, from the manner in which defendant conducted the business, as to whether or not he was the manager and had full control, or otherwise. The court very properly refused to permit the question to be answered, though the district attorney did not state the grounds of his objection." (See also *Careaga* v. *Moore,* (1925) 70 Cal.App. 614, 623 [234 P. 121].)

After that correct ruling to his objectionable question, the attorney for defendant did not pursue further the suggestion he had theretofore made that he had something *"which may be"* in the *"nature"* of inconsistent statements.

The trial judge's unfavorable opinion of the deputy probation officer was not a proper basis for denying probation.

In my opinion the judgment and motion denying a new trial should be affirmed, and the trial judge should reopen the hearing of defendant's application for probation to consider a further report concerning defendant, if any, since the previous ruling on his application.

Respondent's petition for a hearing by the Supreme Court was denied January 14, 1943.